James M. BU, on behalf of his minor child, Marla BU, Wendy Curniffe, on behalf of her minor child, Ingrid Curniffe, Lisandra Magrina, on behalf of her minor child, Mayra Young, Joanne Schwager; O. Aldon James, Jr.; the National Arts Club; Beki Kraynak, Carol Hart, on behalf of her minor child, Joshua Hart; James Hart, and Sandra Morabito, individually and on behalf of her minor child, Steven Morabito, Plaintiffs,

v.

Sharen S. BENENSON, individually and as Trustee of the Gramercy Park Trust; Arthur N Abbey, individually and as Trustee of the Gramercy Park Trust; and the Gramercy Park Trust, Defendants.

No. 01 Civ. 0320(GEL).

United States District Court, S.D. New York.

Aug. 7, 2001.

Laura Kibbe, Kaye Scholer LLP, New York City, of counsel), for Plaintiffs James M. Bu, et al.

Richard H. Dolan, Schlam Stone and Dolan, New York City (Katherine Oberlies, Schlam Stone and Dolan, New York City, of counsel), for Defendants Sharen S. Benenson, et al.

## OPINION AND ORDER

LYNCH, District Judge.

Gramercy Park is a lovely square in Manhattan surrounded by primarily residential buildings The Park is an unusual private amenity, owned in trust for the owners of the adjacent properties by a board of trustees, under the terms of a trust indenture created by the lawyer and real estate developer Samuel B. Ruggles in 1831. In recent years, there has apparently been some contention among the trustees, as well as among factions of the property owners, and even among factions within one of those owners, a not-for-profit entity. The background of hostility among some of the parties to that contention has been visible to the Court in connection with this action, but it is essentially irrelevant to the resolution of the matters before the Court, except to the extent that it may explain some peculiar features of this litigation, which somewhat awkwardly cobbles together civil rights claims brought primarily by a group of schoolchildren and their parents, with claims under the New York law of trusts that call into question the very legitimacy of the trust. This opinion addresses defendants' motion to dismiss the latter claims. For the reasons that follow, the requested relief is granted in part, and denied in part.

## BACKGROUND

Pamela Jones Harbour, Kaye Scholer LLP, New York City (Kerry Alan Scanlon, On April 4, 2000, approximately fifty-five students from Washington Irving High

School, a nearby public school, under the supervision of one parent and four teachers, visited Gramercy Park as part of a school project. The students, most of whom are of African–American and/or Hispanic heritage, were invited to the Park by the National Arts Club ("NAC"), which is a lot owner and therefore a party entitled to use and invite guests to the Park, and/or by its president, plaintiff O. Aldon James, Jr. Defendant Sharon S. Benenson, one of three trustees of the Gramercy Park Trust ("Trust"), noticed the students' presence in the Park and requested that they leave. Benenson claims she was enforcing a Park rule prohibiting groups of visitors. Plaintiffs argue there is no such rule, and that even if there is, it has not been enforced against groups of white visitors. Plaintiffs therefore claim that Benenson was motivated to exclude the schoolchildren by racial bias, in violation of various federal and state civil rights statutes.

Later in April, at a telephonic meeting of the Park trustees, Benenson and defendant Arthur N. Abbey, another Park trustee, voted to send a letter to James, claiming that he had violated Park rules by inviting a large group of guests (as well as by taking a pet into the Park on a separate occasion), and warning that future infractions could lead to suspension of his Park privileges. The third trustee, non-party Steven U. Leitner, opposed this action. James was unmoved by the threat. On June 9, 2000, he (or the NAC) invited a second group of approximately fifteen primarily minority students from P.S./I.S. 217 (on Roosevelt Island) to the Park. Once again, Benenson observed the situation, and asked this group also to leave. Plain-

tiffs claim that this action too was racially motivated.

Plaintiffs, including a number of the affected schoolchildren, joined by James and the NAC, filed a complaint on January 17, 2001, naming Benenson, Abbey, and the Gramercy Park Trust as defendants. The complaint alleged eight causes of action. The first four claims charged that the actions of Benenson and Abbey violated various federal and state civil rights laws by denying equal access to and enjoyment of the Park to beneficiaries' guests on the basis of race. In addition, however, the plaintiffs also allege four claims that Benenson and Abbey have violated their fiduciary duties as trustees, and that the Trust itself is invalid as a matter of New York property law because the original gift in trust violated New York's common-law Rule Against Perpetuities and provisions of the New York statutes relating to trusts as they existed in 1831.

Defendants moved to dismiss the entire complaint on various grounds, arguing among other things that the various civil rights claims failed to state a claim as a matter of law, and seeking pre-discovery summary judgment on those claims. In addition, they moved to dismiss any claims against the Trust as an entity (because the Trust is not, under New York law, a suable juridical entity) and against Abbey (because his acts as alleged in the complaint were purportedly insufficient to involve him in any alleged discriminatory conduct). Finally, defendants argued that federal jurisdiction over the various state property law claims was lacking. After hearing oral argument on June 21, 2001, I disposed of most of those motions in an oral opinion.[1]

---

**1.** Briefly, the motions for dismissal or for summary judgment on the civil rights claims, including those based on state law, were denied. The claims against the Trust as an entity (if any were even asserted) were dis-

missed. The motion to dismiss civil rights claims against Abbey was denied, without prejudice to renewal after a full record is compiled through discovery. These rulings

I reserved judgment, however, on the jurisdictional motion concerning the state trust law claims. This opinion addresses that motion.

## DISCUSSION

### Supplemental Jurisdiction

■ Federal courts exist primarily to decide federal questions. Under the Constitution, most disputes between citizens are to be resolved in the courts of the various states. The "judicial power of the United States," U.S. Const., art III, § 1, is strictly limited to specified types of cases, the very first of which is cases "arising under this Constitution, the laws of the United States, and treaties." *Id.*, § 2.

The civil rights claims brought by the plaintiffs fall squarely within this jurisdiction, since for the most part they are based on "laws of the United States" prohibiting discrimination. The trust law claims, on the other hand, are based on the law of the State of New York. Standing on their own, they would not be within the jurisdiction of this Court, but would have to be brought in the courts of New York.

Plaintiffs contend, however, that this Court should assume jurisdiction over those claims under the doctrine of "supplemental" or "pendent" jurisdiction. The idea is not particularly complicated. Where a plaintiff has claims against a defendant under both federal and state law that substantially overlap, it would be unnecessarily expensive and inefficient to require the plaintiff to maintain two separate lawsuits, one in federal court and one in state court. This case presents a classic example with respect to the state and federal civil rights claims. New York State, as well as the United States, has laws prohibiting discrimination. The very same acts of the defendants that allegedly violat-

ed federal anti-discrimination laws are also claimed to violate the parallel state laws, for essentially the same reasons and under essentially the same legal standards. Since this Court has jurisdiction over the federal claims, it is only sensible for the Court to have authority to adjudicate the state claims at the same time, rather than to require separate state and federal adjudications of the very same case. Plaintiffs argue that the same theory applies to their trust law claims.

The exercise of supplemental jurisdiction is governed by 28 U.S.C. § 1367. That statute provides that, with various exceptions not relevant here, in any case in which a federal court has jurisdiction over a federal claim, the court "shall have supplemental jurisdiction over all other claims that are so related [to the federal claim] that they form part of the same case or controversy." § 1367(a). Even where this condition is met, however, "[t]he district courts may decline to exercise supplemental jurisdiction" under certain circumstances, such as when "the [state law] claim raises a novel or complex issue of State law," or where "the [state law] claim substantially predominates over the [federal] claim or claims." § 1367(c)(1), (2).

The statute, enacted in 1990, embodies and modifies rules developed by the Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In an analysis later adopted by the Second Circuit, *Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 447 (2d Cir.1998), the Ninth Circuit held that Congress intended § 1367 to limit the district courts' discretion to decline supplemental jurisdiction. *Executive Software North America., Inc. v. United States District Court*, 24 F.3d 1545 (9th Cir.1994). Under *Gibbs*, the ex-

were embodied in an order entered on June 25, 2001.

ercise of supplemental jurisdiction was entirely discretionary; the district court could choose whether to accept jurisdiction over supplemental state claims. Under § 1367, however, legal rules limit that discretion. First, § 1367(a) *requires* a district court to exercise supplemental jurisdiction over a state claim that forms "part of the same case or controversy" as the claim conferring federal jurisdiction, unless dismissal is specifically allowed under another provision of the statute. Second, § 1367(c) restores to the court a discretionary authority under which it "may" decline to exercise supplemental jurisdiction, but only under specific circumstances enumerated in that provision. Once a court determines that one of those circumstances is present, "the exercise of discretion ... is informed by whether remanding pendent state claims comports with the underlying objective of most sensibly accommodating the values of economy, convenience, fairness, and comity" laid out in *Gibbs*. *Executive Software*, 24 F.3d at 1559 (internal quotations omitted).

Thus, determining whether to exercise supplemental jurisdiction over a state law claim requires answers to three successive questions: (1) is the state claim within the mandatory supplemental jurisdiction of the Court, because it forms "part of the same case or controversy" as the federal claims; (2) if so, does the case fall within one of the specified circumstances that permit the Court to decline to exercise supplemental jurisdiction; (3) if so, do the values of "economy, convenience, fairness and comi-

ty" support retaining jurisdiction or dismissing the claim.

The first question, whether the claim forms "part of the same case or controversy" as the federal claim, is the functional equivalent of the "common nucleus of operative fact" test laid out in *Gibbs*. *See Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 704 (2d Cir.2000) (applying the *Gibbs* "common nucleus" test); *see% also Naftchi v. New York Univ.*, 14 F.Supp.2d 473, 492 (S.D.N.Y. 1998) *(effect of section 1367(a) was to codify the "common nucleus" test set forth in* Gibbs*); Wright, Miller, & Cooper, Federal Practice and Procedure: Jurisdiction § 3567.1 (2d ed.1984; 2001 Supp.). Essentially, supplemental jurisdiction will be found where the state and federal claims arise from the same basic facts. Conversely, supplemental jurisdiction does not lie "when the federal and state claims rested on essentially unrelated facts."* *Lyndonville*, 211 F.3d at 704. If this standard is not met, the Court lacks jurisdiction over the state law claim. If it is, the Court must exercise jurisdiction, unless one of the specified exceptions applies.

██ If supplemental jurisdiction exists, the second step in the analysis turns to the specified exceptions. Two of those exceptions are potentially relevant here. A district court may decline to exercise supplemental jurisdiction over a claim that raises a novel or complex issue of state law, § 1367(c)(1), or over a state claim that "substantially predominates" over the federal claim, § 1367(c)(2).[2] If none of the

---

**2.** The other two exceptions are cases in which the district court has already dismissed all of the federal claims, § 1367(c)(3), and a residual general exception for "exceptional circumstances, [where] there are other compelling reasons for declining jurisdiction." § 1367(c)(4). The former is plainly not applicable here, since the motion to dismiss the federal claims was denied. The residual ex-

ception should only be employed when circumstances are "quite unusual." *Executive Software*, 24 F.3d at 1558. Application of this exception requires a district court to "articulate why the circumstances of the case are exceptional in addition to inquiring whether the balance of the *Gibbs* values provide compelling reasons for declining jurisdiction in

specified exceptions apply, the Court must accept supplemental jurisdiction of the claim.

If, however, one of these conditions is met, then the Court has the authority to "decline to exercise supplemental jurisdiction." The Court then proceeds to the third step of the analysis, deciding whether or not to exercise that discretionary authority. The court's discretion "is informed by whether remanding the pendent state claims [to the state courts] comports with the underlying objective of most sensibly accommodating the values of economy, convenience, fairness, and comity." *Executive Software* 24 F.3d at 1557 (internal quotations omitted). In effect, the balancing required goes back to the original purposes of recognizing federal jurisdiction over state claims: is it efficient and convenient to determine all the relevant claims in a single proceeding, and would doing so promote fairness and justice to the parties without impinging on the sovereign powers of the state.

### The Claims in this Case

The three federal claims in this action all allege that defendants have violated various civil rights laws by discriminating on the basis of race, in administering the Park's rules about guest privileges, against the school children plaintiffs and the lot owners who invited them to the Park as guests. These claims concern the specific motivations of the defendants, and especially of the defendant Benenson, in ordering the children out of the Park on two specific dates in 2000.[3] The primary relief available under these statutes, as in any

action at law, is monetary damages. *See e.g. City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (injunctive relief only available where plaintiff shows a "real and immediate threat of repeated injury" demonstrated by more than "past exposure to illegal conduct."); *see also Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 68 (2d Cir.1999) ("The basic requirements to obtain injunctive relief have always been a showing of irreparable injury and the inadequacy of legal remedies."). To the extent that equitable relief may be available to prevent future violations of the civil rights laws, it is noteworthy that the complaint includes no other incidents in which minority lot owners or guests have been discriminated against, and pleads no facts from which a reasonable person could infer that these two incidents are part of a pattern or practice of discrimination. Assuming arguendo that injunctive relief of some sort might be shown at trial to be appropriate, there is no reason to think that this relief would extend to a judicial revision in the terms of the trust, none of which is alleged to encourage or authorize discrimination, as opposed to a more conventional order to the trustees not to discriminate in the future.[4]

Plaintiffs' four state trust law claims fall into two categories. First, they argue that Benenson and Abbey violated their fiduciary duties as a trustees under New York law regarding the fiduciary duties of trustees, under both the common law and the New York Estates, Powers and Trust Law § 7–2.6. They also contend that the Gram-

---

such circumstances." *Id.* No such exceptional circumstances are apparent here

3. Presumably the defendants' other actions during recent years in administering the rules relating to groups of guests will be drawn into question as they might bear on the question of an intent to discriminate in these instances

4. There is no dispute that the Court has supplemental jurisdiction over the plaintiffs' parallel claim for violation of the New York State civil rights law, which is analytically similar to the federal claims discussed in the text.

ercy Park Trust itself violates the common law Rule Against Perpetuities as it existed in New York in 1831, and that the creation of a private amenity of this sort was not a purpose authorized for the creation of a trust under the New York statutes in effect at that time. Accordingly, they claim that the Gramercy Park Trust is not a valid trust in the first place.

These claims vary in terms of the facts at issue and the legal relief requested. The violation of fiduciary duty claims are premised on the same acts of discrimination charged in the civil rights counts of the complaint: plaintiffs' theory is that the violations of law they allege demonstrate that the trustees are not fit to exercise their fiduciary responsibilities, having administered their trust unfairly and exposed the Trust to possible legal liability. The relief requested is the removal of the present trustees and their replacement by others. The facts concerning the claims about the formation of the trust, on the other hand, have to do with the acts and intentions of the grantor of the trust in 1831, and the relief requested is the reformation of the trust terms concerning the nature and membership of the board and the actual ownership of the Park itself. To accomplish such reorganization, plaintiffs propose alternative restructuring plans. For example, they suggest that the Trust could be terminated and title vested in the individual lot owners. The lot owners could then form a not-for-profit corporation responsible for management of the Park. Plaintiffs further suggest "a role for Washington Irving on the board of trustees" to prevent future acts of discrimination.[5] (Compl. at 30.) Alternatively, plaintiffs suggest that the Park could be reformed as a charitable trust, subject to oversight by the New York Attorney General. In either instance, plaintiffs request an order requiring periodic elections of trustees (as opposed to the life terms currently provided for under the Trust), and an order prohibiting Benenson and Abbey from serving as a trustees.

### The Legal Standard Applied to the Claims in this Case

Just as the state civil rights claims represent a textbook example of unquestionable supplemental jurisdiction, the claims relating to the formation of the trust are a clear example of a case where supplemental jurisdiction is *not* present. Far from growing out of a "common nucleus of operative facts," *Gibbs*, 383 U.S. at 725, 86 S.Ct. 1130, the civil rights claims and the claims concerning the formation of the trust constitute entirely different cases and controversies.

The facts relating to the two sets of claims involve entirely different people, events, and, indeed, centuries. As noted, the civil rights claims focus on what Benenson did and intended in dealing with the plaintiff schoolchildren and NAC members on two particular dates in 2000. The trust formation claims have nothing to do with Benenson, the schoolchildren, or Aldon James, but deal instead with the actions and intentions in 1831 of Samuel Ruggles, who died long before any of them were born. There is no overlap in facts whatsoever between the two claims.

Plaintiffs try to overcome this obvious fact by pointing out that in ordering the plaintiffs from the Park, Benenson was acting pursuant to her authority as a trustee of the Trust, and that if the Trust did not exist, or had been structured different-

---

**5.** Plaintiffs presumably mean someone associated with Washington Irving High School, and not Washington Irving himself. Although Samuel Ruggles might well have been delighted to see his distinguished elder contemporary as a Park trustee, Irving died in 1859 and is therefore no longer available to serve.

ly, she would have had no such authority. But this argument is not really to the point. Plaintiffs do not allege that the terms of the Trust itself either on their face or in their intent foster discrimination in any way. To the contrary, they argue that the trustees' alleged discriminatory acts *violate* the intent of the donor and the trustees' fiduciary responsibility under the Trust. Neither party points to anything in the Trust documents that would give aid and comfort to racial discrimination.

Plaintiffs' argument, rather, is akin to a contention that a federal claim that a restaurateur refused to serve a person of color can support pendent jurisdiction over an effort by a relative of the defendant, based on state law, to contest the will by which defendant inherited the business. True, perhaps, that absent the will, defendant would not have been in a position to discriminate. But the claims really involve different rights, different interests, and different underlying facts.

Here, too, not only are the underlying facts distinct, but the claims involve different interests advanced on behalf of quite different parties, and potentially leading to quite different kinds of relief. The Rule Against Perpetuities was not devised to prevent discrimination, and a decision to invalidate or reorganize the Trust could affect just about everyone in Manhattan (with no unique impact on the children involved in this lawsuit). The nature of the "case or controversy" presented by the civil rights claims is completely different from that involving the trust-formation claims. The federal civil rights claims

against Benenson require the Court to inquire as to how she exercised her duties as Trustee, not as to the legitimacy of her status as Trustee. To prevail on those claims, plaintiffs are not required to show that the Trust is invalid; rather, they must demonstrate that Benenson invidiously discriminated against them. *See Lyndonville,* 211 F.3d at 705 (vacating district court's exercise of supplemental jurisdiction where state and federal claims shared no common nucleus of operative fact); *see also Young v. New York City Transit Auth.,* 903 F.2d 146, 164 (2d Cir.1990) (holding that challenge to transit regulation prohibiting panhandling and challenge to state penal law prohibiting loitering shared no common nucleus of operative fact); *Wigand v. Flo–Tek, Inc.,* 609 F.2d 1028, 1033 (2d Cir.1980) (reversing the district court's exercise of jurisdiction where the federal claim rested on events prior to the effective date of a contract while the state law claim rested on events occurring after that date).

Even if the claims met the threshold "same case or controversy" requirement, they would fall within the category of cases in which the Court would have the right to decline such jurisdiction. While the Rule Against Perpetuities is anything but "novel," the case would clearly present novel and complex questions of state law within the meaning of § 1367(c)(1). Rules relating to real property are a prototypical example of the kinds of legal issues of uniquely local concern into which federal courts should be reluctant to intervene.[6]

---

**6.** *See City of Chicago v. International College of Surgeons,* 522 U.S. 156, 186, 118 S.Ct. 523, 540, 139 L.Ed.2d 525 (1997) ("Land use cases generally ... implicate 'local policies' and 'local concerns.' "); *see also Natale v. Town of Ridgefield,* 170 F.3d 258, 263 (2d Cir.1999) (federal courts should not to be substituted for state courts as adjudicators in land use dis-

putes); *Gottlieb v. Village of Irvington,* 69 F.Supp.2d 553, 555–556 (S.D.N.Y.1999) (citing Second Circuit distaste for federal interference in local land use matters); *Seiler v. Charter Twp. of Northville,* 53 F.Supp.2d 957, 964 (E.D.Mich.1999) ("Although Plaintiff's federal and state claims arise out of the same facts and circumstances, land use decisions

And the questions here would require the Court not only to address the Rule Against Perpetuities—something of a byword for the most arcane and complicated of property law rules—but also to interpret the state of New York law in 1831, addressing statutes and doctrines that no longer exist in the form relevant to the decision. It is difficult to imagine a less suitable topic for a federal court, or a clearer example of a case presenting novel and complex state law issues. *See Seabrook v. Jacobson,* 153 F.3d 70, 72–73 (2d Cir.1998) (vacating district court's exercise of supplemental jurisdiction over a question of state law which was undecided and required a balancing of numerous important policies of state government); *see also Support Ministries for Persons with Aids, Inc. v. Waterford,* 799 F.Supp. 272, 280 (N.D.N.Y.1992) (declining to make a novel and potentially extremely significant interpretation of state law).

Similarly, the state law claims would inevitably come to "predominate" over the federal claims, within the meaning of § 1367(c)(2). The federal claims asserted by plaintiffs involve vital human rights against racial discrimination, and deserve to be treated as centrally important to any case in which they appear. These claims, however, relate to a small number of parties, and are likely to be redressed, if the claims are successful, by the payment of compensation and perhaps rather modest changes in the operation or rules of the Park. The claims for reformation of the Trust, on the other hand, would involve the property rights of hundreds of people who currently have a beneficial interest in the Trust, and ultimately the disposition of a virtually priceless piece of Manhattan real estate. Indeed, the Park is more than just an expensive piece of property; it is a

historic landmark that has been in place for 170 years. To consider reconstituting the Park as a public charitable trust would require the participation not only of the hundreds of property owners who could lose valuable property interests, but that of the City and State of New York, all of whose citizens would have an interest in what became of the land. The possibility that the Trust might become the private property of Ruggles' heirs (whoever they might be), or a public amenity administered by the City or State, would undoubtedly become a matter of general public importance and political controversy about which public emotions would run high. It is fatuous to contend that these interests would not come to predominate over those of a particular group of schoolchildren. *See AT & T Corp v. New York City Health & Hosps. Corp.,* 72 F.Supp.2d 398, 400 (S.D.N.Y.1999) (declining to exercise supplemental jurisdiction over more complex, third party state claim).

And if the Court has discretion to decline jurisdiction in this regard, this Court would surely exercise that discretion not to take jurisdiction over the claims. As already noted, the state law claims are appropriately addressed in a state court, not only because of the greater expertise the state court would bring to the questions, but because the consequences are ones of great local significance. Far from enhancing the convenience of the parties and the efficiency of resolving the dispute, accepting supplemental jurisdiction of these claims would complicate dispute resolution, by injecting into an important but simple civil rights case additional parties and issues that would overshadow the interests of most of the plaintiffs and delay resolution of their claims.

generally implicate local interests and concerns, and the Court questions the wisdom of federal courts unnecessarily interjecting themselves into an area of the law that is of particular concern to state and local government.").

Accordingly, the Court holds that supplemental jurisdiction does not exist over the claims relating to the formation of the Trust, and Counts VII and VIII of the Complaint are dismissed for lack of jurisdiction.

■ Plaintiffs' fiduciary responsibility claims present a closer question. Although the effort to unseat the majority of the present trustees presents a more difficult set of remedial issues than the civil rights claims proper, it cannot be denied that the claims of breach of fiduciary duty, though premised on a different legal theory implicating the interests of different individuals, arise from the very same acts alleged to violate the civil rights laws, and indeed to some extent depend on a determination that those laws have been violated. Plaintiffs contend that the manner in which Benenson misinterpreted and misapplied the Gramercy Park Trust rules (i.e., the invidious discrimination itself) constitutes a violation of her duties as fiduciary. These claims clearly arise out of the same "common nucleus of operative facts" as plaintiffs' federal claims. Thus, the basic predicate of supplemental jurisdiction—that the two sets of claims form part of the same case or controversy because they arise from the same factual incidents and require resolution of essentially the same factual issues—is present.

Nor is there a reason for the Court to decline supplemental jurisdiction over these claims. The legal questions involved are not particularly complex. There is little doubt that violations of fundamental federal civil rights laws, if proven, would violate the fiduciary responsibilities of trustees charged with administering a public trust that was beneficently intended, who have at a minimum an obligation to avoid violating the law and incurring costly liability therefor. Nor is there much risk that these claims, which to some extend are parasitic on the federal civil rights violations, would overshadow them in the public eye or in the litigation process. Accordingly, these claims do not fall within the categories of case over which the Court may decline jurisdiction under § 1367(c).[7] Accordingly, the motion to dismiss is denied as to Counts V and VI of the Complaint.

## CONCLUSION

The two sets of claims in this case roughly correspond to two different though overlapping disputes. The civil rights claims concern alleged denial of appropriate welcome and respect to a group of schoolchildren, while the trust claims involve a struggle among adults for control of the trustees of a valuable piece of property. The Court trusts that the adult parties to the case, and the distinguished lawyers and law firms who represent all the parties, will not allow the rights of children to become counters in a struggle in which they have little stake. Whether or not plaintiffs can ultimately establish that they have been victims of racial discrimination, there seems to be no dispute that they were victims of rudeness and mistreatment. Similarly, whether or not plaintiffs can ultimately establish an entitlement to any legal relief, persons of good will surely could not believe that occasional supervised educational visits to this historic architectural and natural setting by neighborhood school children at the invitation of its beneficial owners are inconsistent with the purposes for which the Trust was cre-

---

7. Indeed, it is not even clear that defendants challenge the Court's jurisdiction over these claims. At a minimum, defendants fail to present a detailed analysis of why these particular trust claims exceed the Court's jurisdiction, concentrating their analysis of the trust claims on those relating to the formation of the Trust.

ated. If counsel and the parties would turn to negotiating a resolution of this dispute that would serve the interests of the lot owners and the children with the same energy that has been expended on internecine battles for control of the board of trustees, the unhappy experiences that occasion this lawsuit could yet become beneficial for all concerned. The complaint in this case seeks relief that is equitable in nature. Should plaintiffs establish entitlement to equitable relief, the parties should be on notice that equity will not reward any party that puts factional warfare or personal spite above seeking a good faith resolution of a claim of harm to children. For the reasons set forth above, Counts VII and VIII are dismissed for lack of jurisdiction. Except to the extent granted in the Court's order of June 25, 2001, defendants' motions are denied in all other respects.

SO ORDERED.