NATIONAL COUNCIL OF ARAB AMERICANS and Act Now to Stop War & End Racism Coalition, Plaintiffs,

v.

The CITY OF NEW YORK, Michael Bloomberg, Mayor of the City of New York in his official capacity, City of New York Department of Parks and Recreation and the Central Park Conservancy, Defendants.

No. 04 Civ. 6602(WHP).

United States District Court, S.D. New York.

Aug. 23, 2004.

---

David Milton, Moore & Goodman, LLP, New York City, Mara Verheyden-Hilliard, Partnership for Civil Justice, Washington, DC, for Plaintiffs.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

Plaintiffs move for a preliminary injunction directing the New York City Department of Parks and Recreation (the "Parks Department") to grant them a permit to hold a demonstration of 75,000 people on the Great Lawn in Central Park on the eve of the Republican National Convention in New York. They also seek to preliminarily enjoin enforcement of the Parks Department's permit regulatory scheme. This application presents intersecting public interests: the right "of the people peaceably to assemble" and the stewardship of a unique pastoral oasis amid a towering urban landscape.

For the reasons that follow, Plaintiffs' application to mandate the issuance of their permit on the terms they requested, and to preliminarily enjoin enforcement of the existing permit regulatory scheme, is denied. Nevertheless, this Court is convinced that the parties could bridge their differences and fashion a revised permit that would allow a political assembly on the Great Lawn. Because only five days remain before the proposed demonstration and this Court is persuaded that August 28, 2004 has symbolic importance to Plaintiffs, this Court will offer some observa-

tions at the conclusion of this Memorandum and Order.

## BACKGROUND

The Republican National Convention will begin in New York on August 30, 2004. That event has been anticipated by many organizations and is the catalyst for a number of planned mass demonstrations. (Declaration of Elizabeth W. Smith, dated Aug. 18, 2004 ("Smith Decl.") ¶¶ 18–20; Transcript of Oral Argument, dated Aug. 20, 2004 ("Tr.") at 82.) Indeed, the Parks Department received thirty different applications for special permits to conduct rallies or demonstrations during the convention week. (Tr. at 82.) Those permit requests emanated from a broad spectrum of advocacy groups, some well known such as the "National Organization of Women", and others less familiar (at least to this Court) like "Dogs Against Republicans". (Smith Decl. ¶¶ 18, 20.) This tsunami of special permit applications has posed its own logistical challenges.

### I. Events Leading to the Litigation

On January 7, 2004, the National Council of Arab Americans (the "Council") applied for a permit to conduct a rally on August 28, 2004 on the Great Lawn or Sheep Meadow[1] in Central Park. (Smith Decl. Ex. A.) The event was described as one for 75,000 people that would run from 10:00 a.m. to 6:00 p.m. and require use of the Great Lawn or Sheep Meadow for a 24 hour period. (Smith Decl. Ex. A.) It did not provide for a rain cancellation date. (Smith Decl. Ex. A.) Because of the influx of other applications, the Parks Department notified the Council on March 13, 2004 that a decision on the Council's permit application would be deferred pending

---

**1.** While the Council's application for a special event permit sought use of Sheep Meadow or the Great Lawn, this action and their preliminary injunction application focus exclusively on the Great Lawn.

completion of the City's strategic plan for security in New York during the Convention. (Smith Decl. Ex. B.) Nevertheless, in that initial communication, the Parks Department raised a trident of concerns with the Council's application: "the capacity of the Great Lawn, the high risk of damage to the lawn and the displacement of preexisting uses." (Smith Decl. Ex. B.) The parties did not discuss the permit application or the City's letter.

In mid-June, the Parks Department advised the Council by telephone that "[t]he permit as requested is denied" and "you are not getting the Great Lawn; there is nothing to resolve." (Tr. at 72; see Smith Decl. ¶ 26.) The parties and their attorneys then began a Kabuki dance of correspondence that led to this lawsuit. (see Smith Decl. Exs. C–H.)

On June 15, 2004, the Parks Department formally denied the Council's permit request, citing Sections 2.08(c)(1)—(2) and (5) of the Parks Rules and Regulations:

> Neither the Great Lawn nor the Sheep Meadow can accommodate an event of the nature you are planning. Since the Great Lawn was restored between 1995 and 1997, it has been carefully managed so that the restoration accomplished through significant public and private investment can be preserved. Likewise, the Sheep Meadow underwent a significant restoration in 1981 and is now limited to passive recreation.

(Smith Decl. Ex. C.) While denying the permit request, the Parks Department offered to meet with the Council "to discuss possible alternative locations that would be more suitable" for the demonstration. (Smith Decl. Ex. C.) The Council appealed the permit denial, but did not respond to the Parks Department's overture to meet. (Smith Decl. Ex. D.)

On June 30, 2004, the Parks Department denied the Council's appeal, alluding to the potential destruction of the Great Lawn should wet conditions exist at the time of the event, and again invited the Council to meet with City officials to discuss alternative locations. (Smith Decl. Ex. E.) The Council responded promptly on July 1, 2004. (Smith Decl. Ex. F.) Although claiming that it was "amenable to meeting with the Parks Department to facilitate this matter," the Council imposed preconditions by seeking a more fulsome explanation of the reasons for the City's permit denial and demanding a list of alternative locations for which the Parks Department would issue a permit. (Smith Decl. Ex. F.)

The Parks Department did not respond to the Council's specific requests. Instead, on July 16, the City renewed its offer to meet with the Council "to find a suitable site for the proposed event on August 28, 2004." (Smith Decl. Ex. G.) At that time, the Parks Department cautioned the Council that it might not be able to find a location for the event if the parties did not meet soon because of the significant number of permits that were being issued. (Smith Decl. Ex. G.) This time, the Council chose not to respond.

On August 6, 2004, the Parks Department explicated the reasons why it would not grant a permit to the Council for a demonstration on the Great Lawn. (Smith Decl. Ex. H.) Specifically, the Parks Department advised the Council that the only organized events allowed on the Great Lawn since its 1997 restoration have been those events that can be cancelled when the ground is wet. (Smith Decl. Ex. H.) More importantly, the Parks Department explained: "[o]ur management criteria for the Great Lawn are not compatible with events that cannot ... comply with our crowd control and security requirements even under optimum conditions." (Smith Decl. Ex. H.) In another pro forma gesture, the Parks Department invited the

Council to meet to find an alternative site suitable for the event. (Smith Decl. Ex. H.) The Council did not respond. Instead, the Council filed this lawsuit at the end of the day on Friday, August 13, 2004.

The Council has teamed up with Act Now to Stop War & End Racism ("ANSWER") coalition in this lawsuit. ANSWER did not apply for a permit in Central Park or participate overtly in the Council's application process. (*see* Smith Decl. Ex. A; Smith Decl. ¶ 21.) Since September 11, 2001, ANSWER has organized many mass demonstrations in Washington, D.C. and New York City with some crowds approaching 500,000 people. (Declaration of Brian Becker, dated Aug. 17, 2004 ("Becker Decl.") ¶ 9.)

While the Council and ANSWER moved for emergency relief in this action, they did not apply to the Court by order to show cause. Instead, they filed their Complaint with a bare bones notice of motion for a preliminary injunction and a memorandum of points and authorities without any supporting papers. By letter dated August 16, 2004, Plaintiffs sought a hearing on their preliminary injunction on August 20, 2004. Even then, the appendix of materials relating to Plaintiffs' motion was not on file with the Court. This Court conducted a telephone conference on August 17, 2004 to address the scheduling of Plaintiffs' application for emergency relief. By Order dated August 17, 2004, this Court directed Plaintiffs to file and serve the papers in support of their application "forthwith." (Order, dated Aug. 17, 2004.)

## II. *Significance of the Great Lawn*

On occasion, litigation provides an avenue for parties to articulate their positions more transparently than the events leading to the lawsuit. This appears to be one of those cases. The lack of engagement between the parties prior to this lawsuit contributed to each side's failure to appreciate the significance of the Great Lawn to the other.

Prior to this litigation, neither side ever discussed revisions to the permit application, or alternative venues. The lack of a rain date or weather cancellation contingency was never ventilated. It was only after this litigation commenced that the Parks Department proposed alternative locations. (*see* Smith Decl. ¶¶ 63–66.) In contrast, the City engaged in a dialogue with other advocacy groups to accommodate their respective concerns and reached agreement for demonstrations with all but two applicants. (Smith Decl. ¶¶ 18–20.)

The Parks Department offers a number of alternative sites, including Flushing Meadow Park in Queens and Van Cortland Park in the Bronx, both of which are capable of handling events of 75,000 or more people in any weather condition. (Smith Decl. ¶ 65.) Within Central Park, the Parks Department suggests the East Meadow, an area capable of accommodating a smaller crowd of 50,000 people in any weather condition. (Smith Decl. ¶¶ 63–64.)

If none of these alternative sites were acceptable to event organizers, the Parks Department represents that it would have referred the Council to the New York City Police Department for assistance in finding a location elsewhere in the City. (Smith Decl. ¶ 66.) However, Plaintiffs insist that only one place will do: the Great Lawn. (Tr. at 38–39.)

Since filing this litigation, Plaintiffs assert that the choice of August 28, 2004 for a rally on the Great Lawn serves several purposes. First, the rally coincides in time and space with the Republican National Convention and presents an opportunity to demonstrate against President George W. Bush. (Becker Decl. ¶ 2.) Second, it falls on the 41st anniversary of the 1963 civil rights march on Washington, D.C., led by Dr. Martin Luther King, Jr.

and commemorates the struggle for civil rights. (Becker Decl. ¶¶ 3–4.) Third, the Great Lawn offers an "unconfined, family friendly mass rally venue whose historic tradition is devoid of confrontation and conflict." (Becker Decl. ¶ 5.) Fourth, "[t]he Great Lawn is, for New York, what the Lincoln Memorial was for Washington, D.C.: A historic place, one that was associated with the mass mobilization for people of justice, seeking justice." (Tr. at 9.)

Indeed, at the preliminary injunction hearing, the symbolic importance of the Great Lawn to Plaintiffs was described. Brian Becker, the national coordinator for the ANSWER coalition, characterized the Great Lawn as "the flagship . . . where people gather" (Tr. at 10), and "the heart and soul of New York City." (Tr. at 35.) Becker explained:

> [T]he Great Lawn is the place where mass assembly has taken place. It symbolizes to the Arab American community and their allies . . . [a] link for something through a historic continuum with Dr. King's 1963 march. I consider, the Great Lawn if it's available, and if there's no reason to deny the use of it, to be the only appropriate place.

(Tr. at 39.) Thus, Plaintiffs argue that assembly on the Great Lawn is part of their political message, namely acceptance and equality of Arab Americans. (Tr. at 76–77.)

The Great Lawn is also of tremendous import to Defendants. After decades of overuse, it was restored in 1997 at a cost of over $18 million. (Smith Decl. ¶ 36; Declaration of Neil Calvanese, dated Aug. 18, 2004 ("Calvanese Decl.") ¶ 20.) It consists of approximately twelve acres of "hearty" Kentucky blue grass, 25,000 cubic yards of soil engineered to resist compaction, 22,500 linear feet of storm turn and sub-surface drainage lines, 11,000 linear feet of irrigation lines with 275 pop-up sprinklers, and eight baseball diamonds. (Pl.Ex. 20: New York City Press Release, dated Oct. 10, 1997.) Since 1997, the Great Lawn has been managed under a comprehensive plan developed by the Parks Department and the Central Park Conservancy in consultation with soil and turf specialists as well as engineering and architectural firms. (Calvanese Decl. ¶ 21.) That management plan limits large events on the Great Lawn to no more than six each year, including two Metropolitan Opera ("Met") productions and two New York Philharmonic ("Philharmonic") concerts. (Calvanese Decl. ¶¶ 21–22; Tr. at 66–67.) Met and Philharmonic events are considered "low impact," because the audiences do not exceed 80,000 and are dispersed on blankets for periods generally not exceeding three hours. (Smith Decl. ¶ 40; Calvanese Decl. ¶ 25; see Pl.Ex. 27: Allan Kozinn, *Music Review: An Evening of Sweetness and Flash in the Park*, N.Y. Times (July 29, 1999) at E5.) Importantly, Met and Philharmonic events are rescheduled or stopped if the Great Lawn is wet. (Smith Decl. ¶ 41; see Calvanese Decl. ¶ 25.)

The Parks Department estimates that no more than 80,000 people can be accommodated at an event on the Great Lawn. (Pl.Ex. 26: Letter from William T. Castro to Steven Ault, dated Apr. 26, 2004.) Moreover, events must be dispersed over time to allow for aeration and over-seeding of the turf. (Calvanese Decl. ¶ 25.) In addition, certain seasonal conditions, such as freezing weather, preclude use of the Great Lawn for any event. (Smith Decl. ¶ 45; Calvanese Decl. ¶ 14.) For example, the possibility of snow and ice led to the denial of a permit for a millennium concert by Billy Joel on the Great Lawn. (Smith Decl. ¶ 45.)

Since restoration of the Great Lawn, no events have been permitted unless the size of the crowd was controlled and the event

could be cancelled if wet turf conditions prevailed. (Calvanese Decl. ¶ 30.) While Plaintiffs point to a number of large events that were sited on the Great Lawn in earlier years, including an anti-nuclear rally, a Papal mass, and a Paul Simon concert, these events occurred prior to restoration of the Great Lawn. (Tr. at 9–10.) Before 1996, use of Central Park's open areas was unlimited and the Central Park landscape suffered as a result. (Calvanese Decl. ¶¶ 5–6.) The City offers dramatic photographs of the Great Lawn as a scene of desolation during the "dust bowl" era. (Smith Decl. Ex. I; see Calvanese Decl. ¶ 19.) Understandably, the City does not want to return Central Park to that land management regime.

The City argues that the Great Lawn would be damaged significantly by a rally of 75,000 if it rained the day before or the morning of the rally. (Smith Decl. ¶¶ 51–52.) Based on lessons learned through experience, the City projects that a mass gathering on a wet Great Lawn would result in its closure for many months and thousands would be deprived of casual recreation or the opportunity to relax there. (Smith Decl. ¶ 44, 51–52, 68; Calvanese Decl. ¶ 15.) For example, in October 1997, a "Family Reunion" event involving 50,000 people was conducted on the Great Lawn following the New York City marathon. Because it had rained the day before that event, the damage to the Great Lawn was so significant that its reopening that next Spring was delayed. Last year, a Dave Matthews concert attracted 85,000 people, a crowd which exceeded the appropriate capacity for the Great Lawn. (Calvanese Decl. ¶ 29.) While weather and turf conditions were "ideal" and state of the art "load-in" and "load-out" procedures were used, the Great Lawn sustained $140,000 in damage. (Calvanese Decl. ¶ 29.) As a consequence, it was closed for several weeks to all activity to allow for aeration and over-seeding. (Calvanese Decl. ¶ 29.)

Plaintiffs discern an emotional pressure among some Americans for a demonstration in Central Park. (Tr. at 53.) Indeed, Mr. Becker predicted a "surge of excitement and enthusiasm" if a court ruled the Great Lawn available for lawful mass assembly, because "millions and millions of people are paying attention" and "a lot of people who might not at this moment think about coming to Central Park a week before would find a way to get there." (Tr. at 52–53.) Further, a parallel state-court litigation by United for Peace and Justice seeks a permit to hold a demonstration of 250,000 people on the Great Lawn on Sunday, August 29, 2004, the day after the rally requested in this action. (Tr. at 63, 67–68; Smith Decl. ¶ 69.) Defendants argue that both a crowd of 250,000 people and two back-to-back events would decimate the Great Lawn. (Tr. at 66–69; Smith Decl. ¶ 49, 69.) Given the intense public interest in these proposed events, the possibility exists that a demonstration estimated to be 75,000 could swell several magnitudes, overwhelm the police and destroy the Great Lawn. Plaintiffs concede that destruction of the lawn would be "a terrible thing." (Tr. at 56.)

There were five different permit applications to use the Great Lawn for a rally during the Republican National Convention week. (Tr. at 65.) Three of the five applicants have been accommodated in alternate venues, leaving just the Council and United for Peace and Justice. (Smith Decl. ¶ 19.) The City contends that if all five were granted, the Great Lawn would be closed for a lengthy restoration and New Yorkers would lose something sublime. (Tr. at 65.) Alternately, the City fears that allowing just one event would invite litigation from the other permit applicants. (Tr. at 65, 70.) Patently, choosing one group over another would require an insulating time, place and manner justification.

### III. *Security Concerns*

This litigation is not unfolding in a vacuum. Defendants also have alluded to certain security concerns over having the Great Lawn used for demonstrations. In coordinating the allocation of demonstration space, the City's strategic plan must take into account the safety and security of all New Yorkers and visiting dignitaries during the Republican National Convention. (Smith Decl. Ex. B.) As a result, "public safety issues" require the "coordination of many [city] agencies, including the New York City Police Department." (Smith Decl. Ex. B; *see* Declaration of John McManus, dated Aug. 18, 2004 ("McManus Decl.") ¶ 3.) All organized events must comply with crowd control and security requirements. (Smith Decl. Ex. H.)

As a result of planning by the City's agencies, a number of rallies and demonstrations will take place throughout Manhattan during the period of the Republican National Convention. (McManus Decl. ¶ 7.) Undoubtedly, these different events will tax law enforcement resources. Further, the proliferation of permitted mass rallies and the possibility that other demonstrations may erupt spontaneously requires advance tactical planning by law enforcement. (McManus Decl. ¶ 8.) Additionally, all these events will take place against the backdrop of "a persistent threat of terrorist attack." (McManus Decl. ¶ 8.)

### *DISCUSSION*

### I. *Laches*

■ Defendants argue that the doctrine of laches prohibits Plaintiffs from obtaining the equitable relief of a preliminary injunction. Where a defendant raises a potentially meritorious laches defense, it is appropriate to consider that issue in the preliminary injunction context. *See Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 132 (2d Cir.2003).

Laches "bars injunctive relief where [a] plaintiff unreasonably delays in commencing [an] action." *Tri–Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 44 (2d Cir.1994). The doctrine reflects the principle that "he who comes into equity must come with clean hands." *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir.2000) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945)).

■ Grounds for laches exist when a plaintiff unreasonably and inexcusably delays in seeking an injunction, and the defendant is prejudiced by that delay. *Perez v. Danbury Hosp.*, 347 F.3d 419, 426 (2d Cir.2003); *Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.*, 959 F.2d 409, 423 (2d Cir.1992). Here, the Council claimed as early as June 25, 2004 that the Parks Department had violated the First Amendment in denying the permit. Since then, the Parks Department twice reached out to the Council to ensure that the Council understood the need to respond quickly to secure a site for its proposed demonstration. (*see* Smith Decl. Exs. G, H.)

■ Plaintiffs delayed until August 13, 2004—one and a half months after the Parks Department's final ruling and a mere 15 days before the proposed demonstration—to come to this Court for relief. To a significant degree, the emergency created by this preliminary injunction application is of Plaintiffs' making. Despite raising the issue of its alleged First Amendment violation as early as June 25th, the Council waited until August 13th to file suit. Then, instead of moving by order to show cause with a complete set of motion papers, Plaintiffs moved for a preliminary injunction without supporting papers. Emblematically, the declarations supporting the preliminary injunction motion are

dated August 17, 2004, four days after the notice of motion was filed.

With less than a week to respond to Plaintiffs' motion for preliminary injunction, Defendants were forced to defend a constitutional challenge threatening the existence of the Parks Department's permit scheme. *See Irish Lesbian & Gay Org. v. Giuliani,* 918 F.Supp. 732, 748–49 (S.D.N.Y.1996) (finding prejudice to defendants in the "preparation and presentation of their respective cases" where plaintiff sought to enjoin the issuance of a parade permit only 19 days before the parade and over one month after the permit had been denied). Plaintiffs' unreasonable delay prejudiced Defendants in the preparation of this case. Accordingly, this Court finds Plaintiffs are barred by laches. While not necessarily unconscionable, *see New Era Publications Int'l, ApS v. Henry Holt and Co., Inc.,* 873 F.2d 576, 584–84 (2d Cir. 1989), Plaintiffs' delay is one of the equities that argues strongly against granting a preliminary injunction. *Irish Lesbian and Gay Org. v. Giuliani,* 918 F.Supp. 732, 749 (S.D.N.Y.1996).

## II. *Standard for Preliminary Injunction*

■ When a party seeking a preliminary injunction seeks "to stay governmental action taken in the public interest pursuant to a ... regulatory scheme," the injunction should be granted only if the moving party can demonstrate irreparable harm and establish a likelihood of success on the merits. *Bery v. City of New York,* 97 F.3d 689, 694 (2d Cir.1996). Additionally, where, as here, the injunctive relief sought would alter rather than maintain the status quo, the moving party must establish a "clear" or "substantial" likelihood of success on the merits. *See Sunward Elec. Inc. v. McDonald,* 362 F.3d 17, 24–25 (2d Cir.2004). This heightened standard "reflects the idea that governmental policies implemented through presumptively reasoned democratic processes are

entitled to a higher degree of deference and should not be enjoined lightly." *Able v. United States,* 44 F.3d 128, 131 (2d Cir.1995).

### A. *Irreparable Harm*

■ "Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction." *Bery,* 97 F.3d at 693 (citing *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). Thus, Plaintiffs' allegations are sufficient to satisfy the irreparable injury requirement.

### B. *Likelihood of Success on the Merits*

■■ Political demonstrations conducted in traditional public fora such as parks constitute protected activity under the First Amendment. *See Gregory v. City of Chicago,* 394 U.S. 111, 112, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969); *Hague v. Comm. for Indus. Org.,* 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (stating that parks "have immemorially been held in trust for use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."). However, the right to engage in expressive political activity in public fora is not absolute. *See Texas v. Johnson,* 491 U.S. 397, 406, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); *Hague,* 307 U.S. at 516, 59 S.Ct. 954. Such conduct "may be regulated in the interest of all[,] ... and in consonance with peace and good order." *Hague,* 307 U.S. at 516, 59 S.Ct. 954.

■ Accordingly, municipalities may regulate the use of public facilities "to assure the safety and convenience of the people in their use." *Cox v. Louisiana,* 379 U.S. 536, 554, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). Reasonable "time, place or manner" restrictions on protected speech

are permissible so long as they are content-neutral, narrowly tailored to serve a significant governmental interest, and leave open adequate alternative channels of communication. *See Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

### 1. *Plaintiffs' Facial Challenge*

Plaintiffs argue that Defendants should be enjoined from enforcing the Parks Department's permit scheme because it is neither content-neutral nor narrowly tailored to a significant governmental interest. Plaintiffs also contend that the scheme allows City administrators unfettered discretion in making permit determinations, thus rendering it difficult to distinguish between legitimate and abusive exercises of authority.

Promulgated pursuant to Section 533 of the New York City Charter, the Parks Department rules and regulations require that any group of more than twenty persons desiring to hold an event on park property apply for a special event permit. *See* 56 R.C.N.Y. §§ 1–02, 1–05(a). The permit regulations govern all uses of the City's parks that involve more than 20 people, except "casual park use by visitors or tourists." 56 R.C.N.Y. § 1–02. Permits are therefore needed for barbeques, picnics, concerts, athletic and social events, as well as First Amendment protected activities such as religious services or political demonstrations. *See* 56 R.C.N.Y. § 1–02.

Section 2–08 provides the mechanism for obtaining a special event permit. Those seeking to organize an event of more than twenty people at one of the City's parks must submit a permit application on preprinted forms provided by the Parks Department. 56 R.C.N.Y. § 1–02(b)(3).

Upon receipt of the application, the Parks Department determines the suitability of the location sought. *See* 56 R.C.N.Y. § 2–08. The Parks Department may deny a special event permit for five reasons: (1) the location sought is unsuitable because of landscaping, planting, or other environmental conditions; (2) the location sought is unsuitable because it is a specialized area, or because the proposed event cannot reasonably be accommodated in that location; (3) the date and time requested have previously been allotted by permit; (4) the applicant, having been granted a permit previously, knowingly violated a material term or condition of that permit; or (5) the event would interfere unreasonably with the enjoyment of the park by other users. 56 R.C.N.Y. § 2–08(c). However, if a permit application is denied, the Parks Department must "employ reasonable efforts to offer the applicant suitable alternative locations and/or time and/or dates for the proposed dates." 56 R.C.N.Y. § 2–08(d).

On its face, this permit scheme is, quite palpably, content neutral. "The principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of the disagreement with the message it conveys." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746; *City of Renton v. Playtime Theaters, Inc.,* 475 U.S. 41, 47–48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Here, the permit scheme requires a permit for *any* "special event" involving more than twenty people. *See* 56 R.C.N.Y. §§ 1–02, 1–05(a); *compare Thomas v. Chicago Park Dist.,* 534 U.S. 316, 318, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002) (requiring a permit for any gathering of over fifty individuals). The lone exception for "casu-

al park use by visitors or tourists," 56 R.C.N.Y. § 1–02, does not discriminate based on content because it does not turn on the message, if any, espoused by visitors or tourists. Rather, the distinction relates to the manner in which groups larger than twenty assemble. The Park regulations refer neither to the content of the activity, nor to the event organizers or their views. The permit scheme is, accordingly, content-neutral. *See Ward,* 491 U.S. at 791, 109 S.Ct. 2746; *United For Peace & Justice v. City of New York,* 243 F.Supp.2d 19, 24 (S.D.N.Y.2003), *aff'd* 323 F.3d 175, 176 (2d Cir.2003).

■ Moreover, the permit scheme is sufficiently tailored to a significant governmental interest. A municipality's goal of managing and maintaining park facilities constitutes a significant government interest. *See Clark,* 468 U.S. at 296, 104 S.Ct. 3065 (discussing "substantial [government] interest in maintaining parks . . . in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence"); *Paulsen v. Gotbaum,* 982 F.2d 825, 830 (2d Cir.1992) (describing "substantial governmental interest in conserving parks"); *see also Grossman v. City of Portland,* 33 F.3d 1200, 1206 (9th Cir.1994) (recognizing the possible need for such permits for larger groups "where the burden placed on park facilities and the possibility of interference with other park users is more substantial" than for lone individuals). The New York City permit scheme is limited to events exceeding a certain size, while enabling the Parks Department to regulate the manner in which events take place and the number of attendees at events, and manage upkeep of the parks. Thus, it is narrowly tailored to the government's interest. *Cf. Grossman,* 33 F.3d at 1206 (city ordinance making it unlawful for any person to participate in an organized demonstration or make any address in city park without permit not narrowly tailored

since law reached conduct unlikely to affect government interest in public safety and convenience in use of parks); *Community for Creative Non–Violence v. Turner,* 893 F.2d 1387, 1392 (D.C.Cir.1990) (regulation requiring any individual wanting "to engage in free speech activities" in "organized way" to obtain permit without regard to size of group facially invalid because of overbreadth).

The permit scheme further satisfies the constitutional requisite of allowing for adequate alternative channels of communication since, by its own terms, the Parks Department must make "reasonable efforts" to provide applicants with "suitable alternative locations" for the requested event if their original permit is denied. *See* 56 R.C.N.Y. § 2–08(d).

■ Plaintiffs nevertheless contend that the regulations fail the neutrality requirement since they allow the Parks Department administrators unfettered discretion in deciding whether to grant or deny a permit. Time, place, or manner restrictions of speech in public fora are unconstitutional if they confer overly broad discretion on regulating officials. *See Forsyth County v. Nationalist Mov't,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). "Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." *Thomas,* 534 U.S. at 323, 122 S.Ct. 775. Thus, when assessing the constitutionality of a content-neutral time, place and manner restriction, the analysis hinges on whether the regulation "contain[s] adequate standards to guide an official's decision and render that decision subject to effective judicial review." *Thomas,* 534 U.S. at 323, 122 S.Ct. 775; *Hous. Works, Inc. v. Kerik,* 283 F.3d 471, 478–79 (2d Cir.2002).

Here, as with the Chicago permit scheme upheld in *Thomas,* the regulations

constrain the Parks Department decision-makers by delineating five specific grounds on which a permit may be denied. *See* 56 R.C.N.Y. § 2–08(c); *see also Thomas,* 534 U.S. at 324, 122 S.Ct. 775. As described above, these factors involve inquiries regarding the suitability of the location based on such considerations as environmental conditions, scheduling conflicts, and unreasonable interference with the use and enjoyment of the parks by others. *See* R.C.N.Y. § 2–08; *cf. Thomas,* 534 U.S. at 324, 122 S.Ct. 775 (upholding permit scheme under which officials had to consider enumerated factors including scheduling conflicts, whether intended use would present danger to health or safety of park users, or whether applicant has violated terms of a prior permit). As with the permit scheme at issue in *Thomas,* the Parks Department's permit scheme factors are "reasonably specific and objective, and do not leave the decision 'to the whim of the administrator.' " 534 U.S. at 524, 122 S.Ct. 983 (citing *Forsyth,* 505 U.S. at 133, 112 S.Ct. 2395).[2]

Although, the permit scheme allows Parks Department administrators to consider the "nature" of the proposed event when deciding whether to issue a permit, *see* 56 RCNY § 2–08(c)(2), a Parks Department representative testified that these provisions "are applied based upon the effect of the event on the park and surrounding area, and not upon the message communicated at the event." (Smith Decl. ¶ 7.) The Parks Department's nar-

rowing construction of the regulations invalidate any suggestion that this provision allows officials to take into account the content or message of an applicant's proposed event. *See Ward,* 491 U.S. at 795–96, 109 S.Ct. 2746 (holding that any constitutional concerns raised by the language of the city's sound-amplification guidelines "would have been more than remedied by the city's narrowing construction"); *Hous. Works,* 283 F.3d at 481; *Beal v. Stern,* 184 F.3d 117, 127 (2d Cir.1999).

Similarly, although the permit scheme allows a variance to be issued when "there are significant practical difficulties, or unnecessary hardships, not created or caused by the applicant," 56 R.C.N.Y. § 1–01(c), the Parks Department only issues variances when "someone wants to engage in conduct that would not be allowed in the parks, but that would otherwise be consistent with preserving park resources." (Smith Decl. ¶ 11.) This narrow construction prevents officials from making capricious message-based determinations of permit requests. *See Ward,* 491 U.S. at 795–96, 109 S.Ct. 2746.

Based on the foregoing analysis, this Court finds that Plaintiffs have failed to demonstrate a clear likelihood of success on their claim that the Parks Department permit scheme is facially unconstitutional.

### 2. *The As–Applied Challenge*

■ The Council further contends that the Parks Department's denial of its permit application was unconstitutional.[3] The

---

**2.** Moreover, a permit denial may be appealed within ten days. *See* 56 R.C.N.Y. § 2.08(e); *see also Thomas,* 534 U.S. at 524, 122 S.Ct. 983 (discussing appealability provisions of Chicago permit scheme).

**3.** ANSWER lacks standing to challenge Defendants' denial of the permit. To satisfy the case or controversy requirement of Article III of the Constitution, a plaintiff must establish injury-in-fact, causation and redressability.

*Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102–03, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Sierra Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *accord Baur v. Veneman,* 352 F.3d 625, 631–32 (2003). ANSWER never applied for a permit to demonstrate on the Great Lawn on August 28, 2004, nor was it ever denied one. Accordingly, ANSWER cannot demonstrate that the allegedly improper denial of the requested permit affects it in a direct, "personal

Council has not established a substantial likelihood of success on this claim. The framework governing as-applied challenges to time, place or manner restrictions on speech is the same as that for facial challenges. *See United For Peace & Justice v. City of New York*, 323 F.3d 175, 176 (2d Cir.2003). Accordingly, the regulation at issue must be content-neutral, narrowly tailored to serve a significant government interest and leave open ample alternative channels for communication. *See United For Peace & Justice*, 323 F.3d at 176.

■■■ In its March 13, 2004 communication, while not denying the Council's application, the Parks Department expressed concerns about providing security for the event, the number of people the Council expected to participate in the rally, the possibility of damage to the Great Lawn, and the displacement of others from that space. (Smith Decl. Ex. B.) In its formal denial, the Parks Department explained the statutory bases that rendered the Great Lawn unsuitable for the proposed rally: "landscaping, planting, or other environmental conditions reasonably likely to be harmed"; the "nature or duration" of the event; and "the enjoyment of the park by other users." (*see* Smith Decl. Ex. C (referencing 56 R.C.N.Y. § 2–08(c)).) In response to the Council's appeal of the formal denial, the Parks Department pointed to the damage that might be caused if the turf was wet. (Smith Decl. Ex. E.) Similarly, its last communication, the August 6, 2004 letter, highlighted that the Council had not proposed a contingency plan in the event the Great Lawn was wet. (Smith Decl. Ex. H.) That letter further mentioned the security obstacles the proposed rally would present. (Smith Decl. Ex. H.)

At the preliminary injunction hearing, the Parks Department conceded that a rally of 75,000 people was within the Great Lawn's capacity. (Tr. at 64; *see* Pl.Ex. 26.) Nonetheless, the Parks Department reiterated that it could not grant the Council's permit application in the absence of a rain contingency and some assurance that the Great Lawn's capacity would not be exceeded. (Tr. at 65–66.) The Parks Department also sought a bond to secure against any damage caused during the demonstration. (Tr. at 68.)

The reasons articulated by the Parks Department for denial of the Council's permit application, while at times inconsistent, are legitimate grounds under the permit regulations. None of the stated reasons take into account the subject matter of any speech. Moreover, the Parks Department has previously cancelled other events because of rain (*see* Smith Decl. ¶ 41; Pl.Ex. 27: Anthony Tommasini, *Opera Review: A Park Performance Called by the Elements*, N.Y. Times (June 19, 2002) at E3), and, therefore, the Parks Department's concerns were not *ad hoc*. Accordingly, the Council has failed to establish a substantial likelihood that the Parks Department's decision to deny it a special event permit was content-based.

Nor has the Council established a substantial likelihood that the Parks Department's denial of its application was not narrowly tailored to achieve the City's significant interest of managing and maintaining the Great Lawn. *See, e.g., Clark*, 468 U.S. at 296, 104 S.Ct. 3065. The Parks Department's determination is not unconstitutional simply because this Court might have promoted the governmental interest in a different manner or can conceive of some "less-speech-restrictive alternative." *Ward*, 491 U.S. at 799–800, 109 S.Ct. 2746.

and individual way" that can be redressed if the injunction were issued. *Baur*, 352 F.3d at

632; *Schulz v. Williams*, 44 F.3d 48, 52 (2d Cir.1994).

Nonetheless, a restriction on speech may not burden substantially more speech "than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799, 109 S.Ct. 2746.

The Council's permit application lacked any rain contingency and could only estimate the number of demonstration participants. However, the Council has presented no evidence that, since the restoration of the Great Lawn, the Parks Department has granted similarly incomplete applications involving different kinds of speech. Although permits have been granted for other events, there were sufficient controls, such as rain dates and ticketing. (*See* Smith Decl. ¶¶ 46–49.) Given the Parks Department's stated concerns for the damage Plaintiffs' event could cause, denying the permit "focus[ed] . . . on the source of the evils to be eliminated without restricting significantly a substantial quantity of speech not involving the same evils." *Hous. Works*, 283 F.3d at 481.

This Court finds, additionally, that the Parks Department has satisfactorily made alternative channels of communication available to Plaintiffs. During the course of this litigation, Defendants have mentioned alternate venues for the proposed demonstration, including Central Park's East Meadow, Flushing Meadow Park in Queens, and Van Cortland Park in the Bronx. (Smith Decl. ¶¶ 63–65.)[4] Plaintiffs insist, however, that there are no viable alternative venues to the Great Lawn since it is in the heart of New York City, is a location known for hosting significant events, and presents an "unconfined, family friendly mass rally venue whose historic

tradition is devoid of confrontation and conflict." (Becker Decl. ¶ 2; Tr. at 48, 76.)

Simply because Plaintiffs feel that no other location in New York City is worthy of their cause, however, does not make it so. *See Hous. Works*, 283 F.3d at 481–82 ("That [plaintiff] considers no other City location as beneficial for its purposes as City Hall Plaza does not negate the fact that significant alternate channels are open for the messages it wishes to convey."); *see also Concerned Jewish Youth v. McGuire*, 621 F.2d 471, 476 (2d Cir.1980) ("We do not think that the First Amendment guarantees news publicity for speakers, nor does it guarantee the continued fervor of one's fellow demonstrators."). While Plaintiffs assert that the Great Lawn is a historic forum for mass political assembly, they point to only one political demonstration held there—an anti-nuclear rally in 1982. (Complaint ¶ 7.)

As Plaintiffs acknowledged during the hearing, other parks kept in proper repair would likely offer a family-friendly environment, albeit not in Manhattan. (Tr. at 55.) There is no dispute that the two alternative locations suggested by the Parks Department, Flushing Meadow Park and Van Cortland Park, are family-friendly environments, which can accommodate crowds over 75,000 in any weather conditions. (Smith Decl. ¶ 65.) While neither park is close to the site of the Republican National Convention, the same is true of the Great Lawn in Central Park.

The Parks Department also proposed another suggested venue, the East Meadow, which is located north of the Great Lawn in Central Park. Like the Great

---

4. Though Defendants did not propose specific alternative locations during the flurry of letters preceding this litigation, they repeatedly invited the Council to meet and "discuss possible alternative locations" as early as June 15, 2004, when the permit application was first denied. (Smith Decl. Ex. C.) Defendants have, therefore, complied with the Rules and Regulations, which require the Parks Department to make "reasonable efforts to offer the applicant suitable alternative locations." 56 R.C.N.Y. § 2–08(d).

Lawn, it has been the site of large-scale gatherings, such as concerts by Sting and Sheryl Crow. (Smith Decl. ¶ 64.) While the East Meadow accommodates fewer persons than the Great Lawn, the capacity is of lesser importance if Central Park is the symbol. (Smith Decl. ¶¶ 63–64.) The Council's permit application sought use of either Sheep Meadow or the Great Lawn. (Smith Decl. Ex. A.) The request for two alternative sites in Central Park suggests that the Council considered Central Park—not either site—as the symbolic component of the protest.

The smaller capacity of East Meadow should be of no moment, particularly in light of the Council's initial application for Sheep Meadow. *See United for Peace & Justice*, 243 F.Supp.2d at 30 (finding alternative location for protest adequate because, *inter alia*, it would not limit the number of possible attendees). Like East Meadow, the Sheep Meadow also has a smaller capacity than the Great Lawn. (Smith Decl. ¶¶ 55–58.) Moreover, it is doubtful that even the Great Lawn can accommodate the entirety of Plaintiffs' planned demonstration. Plaintiffs concede that there would be no way to estimate the approximate size of the gathering if they were granted a permit for the Great Lawn:

> "If this Court was to rule that the Great Lawn is not off limits for political legal mass assembly protest, there would be a surge of excitement and enthusiasm, and we don't know what the palpable impact of that would be ... a lot of people who might not at this moment think about coming to Central Park a week before would find a way to get there."

(Tr. at 52–53.) Therefore, there are serious questions whether the Great Lawn can safely accommodate the proposed rally at this point. Accordingly, even if this Court were to require Defendants to issue the permit, Plaintiffs would not be entitled to hold the demonstration exactly as sought, since this Court cannot blind itself to the daunting security concerns facing this City during the Republican National Convention. (McManus Decl. ¶ 8.); *see also Million Youth March, Inc. v. Safir*, 155 F.3d 124, 125–26 (2d Cir.1998) ("The unconstitutionality of the denial ... does not mean that the plaintiff is entitled to have a district court issue an injunction ordering the City to allow the event precisely as the plaintiff wishes to hold it. ... [T]he Court must make a sound exercise of equitable discretion that considers all the relevant circumstances.").

This Court finds that the East Meadow in Central Park or Flushing Meadow Park in Queens or Cortland Park in the Bronx constitute suitable alternative venues for Plaintiffs' proposed assembly. Plaintiffs have failed to demonstrate that these venues are not adequate alternatives. Accordingly, Plaintiffs have not shown a substantial likelihood of succeeding on their claim that the Parks Department permit scheme is unconstitutional as applied to them.

## OBSERVATIONS FOR THE PARTIES

While the litigants are undoubtedly poised for an immediate application to the Court of Appeals, other avenues remain open. This litigation appears to be the first time that the parties engaged in a meaningful way and discussed the proposed assembly on the Great Lawn. To the extent that the City's principal objection revolves around preserving the Great Lawn, the lack of a rain contingency and the inability to control the size of the crowd seem to be the two major obstacles to a permit. In the end, if Plaintiffs insist that the Great Lawn is the only venue for their assembly, it would behoove them to propose a workable cancellation policy and formulate a plan to limit access to no more than 80,000 people. The development of such a plan requires consideration of a

constellation of interests that are dehors the record and beyond the expertise of this Court. Nevertheless, the impediments are not insurmountable and the East Meadow is still available as a stop-gap alternative. (Tr. at 64–65.)

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction requiring Defendants to grant Plaintiffs a permit to hold a demonstration on the Great Lawn on August 28, 2004 on the specific terms they requested, and enjoining enforcement of the Parks Department's permit scheme is denied. The foregoing shall constitute this Court's findings of fact and conclusions of law.

SO ORDERED: