Rebecca BRAY, Thomas Stephanos, Justin McSimov, Dan Fennessey, and Allen Regar, Plaintiffs,

v.

The CITY OF NEW YORK, Raymond Kelly, Police Commissioner of the New York City Police Department, New York City Police Department, New York City Police Officers John and Jane Doe (names and number of whom are unknown at present) and Other Unidentified Members of the New York City Police Department, Defendants.

No. 04 CIV 8255(WHP).

United States District Court, S.D. New York.

Oct. 28, 2004.

---

Steven J. Hyman, McLaughlin & Stern, LLP, New York City, Norman Siegel, New York City, for Plaintiffs.

Michael A. Cardozzo, Corporation Counsel of the City of New York (Robin Binder, Cheryl Neufeld, of Counsel), for Defendants.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

Plaintiffs are participants in Critical Mass, a bike-riding phenomenon in major cities worldwide on the last Friday of every month. The next Critical Mass bike ride will take place tomorrow night, October 29, 2004. Plaintiffs move to preliminarily enjoin the Defendants (collectively, the "City") from seizing bicycles of Critical Mass participants who are not charged with a crime or violation of law. The City counters with its own request for a preliminary injunction prohibiting Plaintiffs and all others with notice from participating in Critical Mass bike rides without a parade permit. For the reasons that follow, Plaintiffs' motion for a preliminary injunction is granted in part, and the City's motion for a preliminary injunction is denied.

## BACKGROUND

Critical Mass bike rides take place in approximately 400 cities on the last Friday of each month. (Compl.¶¶ 16, 17.) They are touted as a means of promoting "the rights of bicyclists and the rights of pedestrians on their own streets" and focusing attention on the "deteriorating quality of life—starting with the toxic levels of air and noise pollution—that cars create for cities." (Declaration of Lt. Daniel Alabano, dated Oct. 25, 2004 ("Albano Decl.") Ex. A: www.times-up.org/cm.php.)

Critical Mass bike rides in Manhattan began in 1994. (Albano Decl. ¶ 3; Compl. ¶ 18.) Initially, the rides attracted few participants; however, in the last two years, their popularity has soared. (Declaration of Asst. Chief Bruce Smolka, dated Oct. 25, 2004 ("Smolka Decl.") ¶ 3.) In 2003, the *Village Voice* deemed Critical Mass bike riders the "Best Disruption of Traffic in New York" and described them as cycling for two hours "wherever their wheels take them." (Albano Decl. Ex. A.) Critical Mass bike rides consistently attracted over 1,000 cyclists in the summer of 2003. (Compl. ¶ 18; Answer ¶ 31.) Because of the ad hoc nature of these events,

the police have improvised on occasion, escorting Critical Mass bike rides to ensure the safety of cyclists and pedestrians. (Smolka Decl. ¶ 13.)

In the summer of 2004, Critical Mass bike rides reached a new crescendo. For example, the July 30th bike ride, attracted approximately 4,000 participants. (Smolka Decl. ¶ 5.) On the eve of the Republican National Convention in New York, 5,000 cyclists participated in the August 27th bike ride. (Smolka Decl. ¶ 6.) The September 24th Critical Mass bike ride drew approximately 1,200 participants. (Smolka Decl. ¶ 9.)

Traditionally, the October Critical Mass bike ride is a popular event that coincides with Halloween, and cyclists are encouraged to come in costume to "maintain[ ] a positive and fun vibe." (Smolka Decl. Ex. B.) Plaintiffs anticipate that the gravitational pull of Halloween in New York will attract a larger than average group of participants for the October 29th ride. (Draft Transcript of Hearing dated Oct. 27, 2004 ("Tr.") at 10.)

New York participants in Critical Mass bike rides assemble at Union Square Park at 7:00 p.m. (Albano Decl. Ex. A.) The events are advertised on the Internet and by environmental and bicycle advocacy groups such as Time's Up! and Transportation Alternatives. (Albano Decl. Exs. A–C; Smolka Decl. ¶ 8.) However, Critical Mass has no leader: "It's an event, not an organization." (Smolka Decl. Ex. C.)

Recent Critical Mass bike rides have not been without incident. During the July 30th bike ride, many of the 4,000 cyclists rode into the Battery Park underpass and onto the F.D.R. Drive. (Smolka Decl. ¶ 5.) Once there, some cyclists blocked entrances and exits, and traffic on the F.D.R. Drive came to a standstill. (Smolka Decl. ¶ 5.) The August bike ride lasted nearly three hours with groups of cyclists proceeding north on Fifth Avenue against traffic and later splintering throughout the East Village. (Smolka Decl. ¶ 6.) Intersections were blocked, midtown traffic was snarled and 264 participants were arrested. (Compl. ¶ 20; Smolka Decl. ¶ 6.)

In an effort to avoid the problems that marred these rides, the City attempted to locate an organization that would apply for a parade permit for the September 24, 2004 bike ride. (Albano Decl. ¶¶ 8–9.) Although the City was unsuccessful (Albano Decl. ¶ 10), the police and an attorney for the New York Civil Liberties Union defused a threatened confrontation and agreed on a route moments before the bike ride began: from Union Square, north on Park Avenue, west on 57th Street, south on Seventh Avenue to Union Square via 17th Street. (Smolka Decl. ¶ 8; Letter to the Court from Christopher Dunn, dated Oct. 27, 2004.) While most participants adhered to the route, some broke off at Park Avenue and 49th Street and then turned north on Fifth Avenue against traffic. (Smolka Decl. ¶ 9.) Because of traffic congestion at Seventh Avenue and 34th Street, another group, including the Plaintiffs, turned east on 36th Street toward Sixth Avenue. (Smolka Decl. ¶¶ 10–11.) A phalanx of police officers on scooters interdicted the 36th Street riders between Fifth and Sixth Avenues. (Affidavit of Rebecca Bray, dated Oct. 18, 2004 ("Bray Aff.") ¶ 3; Affidavit of Dan Fennessey, dated Oct. 18, 2004 ("Fennessey Aff.") ¶ 5; Affidavit of Justin McSimov, dated Oct. 18, 2004 ("McSimov Aff.") ¶ 4; Affidavit of Allen Regar, dated Oct. 18, 2004 ("Regar Aff.") ¶ 3; Affidavit of Thomas Stephanos, dated Oct. 18, 2004 ("Stephanos Aff.") ¶ 4.) While eight cyclists were arrested, the Plaintiffs dismounted and locked their bicycles to parking meters, lampposts and stop signs. (Bray Aff. ¶ 4; Fennessey Aff. ¶ 6; Regar Aff. ¶ 4; Stephanos Aff. ¶ 4.)

Each of the Plaintiffs then left the immediate scene.

When they returned ten to thirty minutes later, one plaintiff found his $110 Kryptonite lock cut in half and his bicycle removed. (Fennessey Aff. ¶ 8.) Three others discovered police in the process of sawing off their locks and seizing their bicycles. (Bray Aff. ¶ 5; McSimov Aff. ¶¶ 6–8; Stephanos Aff. ¶¶ 5–6; Compl. Ex. A.) Plaintiffs who tried to stop the police and prove that the bicycles belonged to them were rebuffed. (McSimov Aff. ¶ 7; Regar Aff. ¶¶ 5–6.) Plaintiff Regar was told that he could recover his bicycle only if he produced a bill of sale. (Regar Aff. ¶ 6.) Since that time, the Plaintiffs have reclaimed their bicycles. The Police Department had custody of Plaintiffs' bicycles for periods ranging from three hours to three weeks. (Bray Aff. ¶¶ 7–8; McSimov Aff. ¶ 9; Stephanos Aff. ¶ 8.) While the City intended to give notices of violation to each Plaintiff and anyone else whose bicycle was seized, no notices were issued. (Albano Decl. ¶ 16.) Seeking to pre-empt charges of retaliation, the City refrained from issuing violations when Critical Mass participants asked to lodge complaints at the time they reclaimed their bicycles. (Albano Decl. ¶ 16.)

The City maintains that Critical Mass cyclists violate traffic regulations and interfere with pedestrian and vehicular traffic by riding through Manhattan streets en masse. (Answer ¶ 32.) As Critical Mass participants assembled in Union Square on September 24th, the New York City Police Department circulated a flyer describing the parade permit requirement and applicable traffic rules. (Albano Decl. Ex. D.) The flyer stated that "[b]icyclists must ride in usable bicycle lanes or near the curb or edge of the roadway, and not ride more than two abreast" and "may not impede pedestrian or vehicular traffic." (Al-

bano Decl. Ex. D.) The flyer also warned that "violators . . . are subject to arrest and bicycle seizure." (Albano Decl. Ex. D.)

New York City's Administrative Code prohibits any "procession, parade, or race" on City streets or in public places absent a parade permit issued by the Police Department. N.Y.C. Admin. Code § 10–110(a). The Police Department issues parade permits for events involving other "loosely associated" individuals, such as the annual Greenwich Village Halloween Parade, and has not denied a parade permit for a bicycle event in the past three years. (Albano Decl. ¶¶ 9, 11.) Nevertheless, no one has ever sought a New York City parade permit for a Critical Mass bike ride. (Albano Decl. ¶ 7.) In fact, Time's Up!'s website advises those interested in joining a Critical Mass bike ride not to get a permit, reasoning that "[t]he point of Critical Mass is that biking is a right, not a privilege." (Albano Decl. Ex. C.) This same group proclaims, "We're not blocking traffic, we *are* traffic!" (Albano Decl. Ex. A.)

The City has offered varying rationales for its seizure of Plaintiffs' bicycles. On September 24th, the Police Department told Plaintiffs that their bicycles were seized because they were abandoned property. (McSimov Aff. ¶ 8.) Plaintiffs were also told that it was illegal to secure bicycles to City property. (Fennessey Aff. ¶ 8.) In this litigation, the City asserts that it was illegal for Plaintiffs to leave their bicycles "unattended on a public street, whether or not they are chained to traffic signs or parking meters." (Def. Mem. at 10.) The City argues that this regulation, N.Y.C. Admin. Code § 16–122(b), was enforced against Plaintiffs by seizing their bicycles to "redress [their] participation, and prevent their continued participation, in the September Critical Mass bike ride, an unlawful bicycle procession that was

dangerous to public safety." (Def. Mem. at 11.)

This action has been litigated at flank speed. Plaintiffs filed their Complaint and moved for a preliminary injunction on October 20, 2004. At a scheduling conference the following day, the City announced its intention to move for a preliminary injunction as well. Because of the urgency of the issues, the parties agreed to an abbreviated motion schedule. On October 25, the City answered the Complaint, counterclaimed for a reverse class action and moved for a preliminary injunction. Plaintiffs replied and opposed the City's motion on October 27. This Court heard argument later that day.

Plaintiffs seek a preliminary injunction prohibiting the City from seizing bicycles of Critical Mass participants unless those individuals are charged with a crime. Given their experience on September 24, Plaintiffs claim to be apprehensive about the possible deprivation of their property if they participate in the October 29th bike ride. They assert that the seizure of their bicycles without notice violates due process and infringes their First Amendment rights to free speech and free association. Nonetheless, in a last-minute salvo, Plaintiffs assert that they "intend to participate" in the October 29th bike ride and "to endeavor to abide by applicable vehicle and traffic laws." (E.g., Affidavit of Rebecca Bray, dated Oct. 28, 2004 ("Bray Supp. Aff.") ¶ 8.) The City seeks to enjoin preliminarily the Plaintiffs and others with notice from participating in the October 29th bike ride and subsequent Critical Mass events unless parade permits are issued by the Police Department.

## DISCUSSION

### I. Preliminary Injunction Standard

"[P]reliminary injunctive relief is an extraordinary remedy and should not be routinely granted." *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir.1986); *accord No Spray Coalition, Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir.2001). A party seeking a preliminary injunction must demonstrate: "(1) that it will be irreparably harmed if an injunction is not granted, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 348–49 (2d Cir.2003). Where the movant seeks to enjoin "governmental action taken in the public interest pursuant to a statutory or regulatory scheme," an injunction will issue only if the movant can establish a likelihood of success. *Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir.1996) (quotations omitted). Moreover, when the injunction would alter rather than maintain the status quo, the standard is elevated to a "clear or substantial likelihood of success." *Sunward Elec. Inc. v. McDonald*, 362 F.3d 17, 24–25 (2d Cir.2004).

### II. Plaintiffs' Motion for a Preliminary Injunction

Plaintiffs seek an injunction preventing the Police Department from seizing the bicycle of any participant in a future Critical Mass bike ride if that participant has not been charged with a crime or violation of law. Because Plaintiffs seek to stay actions taken pursuant to the City's police power, they must establish irreparable harm and a likelihood that they will succeed on the merits of their claim.

The harm Plaintiffs anticipate must be both irreparable and likely to occur. *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir.1985). "The necessary determination is that there exists some

cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). A plaintiff may demonstrate that an injury is likely to occur if the plaintiff has been injured previously by a pattern of officially sanctioned conduct. *See Armstrong v. Davis,* 275 F.3d 849, 861 (9th Cir.2001). Where a defendant has previously engaged in a pattern of similar acts, there is a sufficient likelihood that it will do so again in the near future. *See Armstrong,* 275 F.3d at 861; *Roe v. City of New York,* 151 F.Supp.2d 495, 503 (S.D.N.Y.2001) ("There is no per se rule requiring more than one past act, or any prior act, for that matter, as a basis for finding a likelihood of future injury."); *SEC v. Cap. Growth Co., S.A. (Costa Rica),* 391 F.Supp. 593 (S.D.N.Y.1974) (reasonable likelihood of future activity, and thus imminent harm, could be inferred from past activities even if they had already ceased); *see also New Hampshire Right to Life Political Action Comm. v. Gardner,* 99 F.3d 8, 13 (1st Cir.1996) ("[A] credible threat of present or future prosecution itself works an injury that is sufficient to confer standing, even if there is no history of past enforcement.").

On September 24 2004, police officers confiscated Plaintiffs' bicycles without citing them for any violation. (Bray Aff. ¶ 5; Fennessey Aff. ¶ 8; McSimov Aff. ¶¶ 6–8; Regar Aff. ¶ 7; Stephanos Aff. ¶¶ 5–6.) The officers on 36th Street acted on the orders of their commanding officers, who had issued similar orders on other occa-sions. (Albano Decl. ¶ 14; Smolka Decl. ¶ 12.) Moreover, at the hearing, the City declined to rule out the seizure of unat-tended bicycles on October 29. (Tr. at 33.) Given that the conduct Plaintiffs complain about appears to have occurred in the past as a matter of departmental routine, the threat of imminent injury exists. *See Armstrong,* 275 F.3d at 861; *New Hampshire Right to Life,* 99 F.3d at 13; *Roe,* 151 F.Supp.2d at 503.[1]

As to the likelihood of success element, because the proposed injunction is "tailored to a single event, [and] not an injunction against general enforcement of a detailed regulatory scheme," it is prohibitory rather than mandatory. *Metro. Council, Inc. v. Safir,* 99 F.Supp.2d 438, 443 (S.D.N.Y.2000) ("[N]othing in the proposed injunction would bar the City from a future criminal prosecution of the . . . participants."); *see Sunward Elec.,* 362 F.3d at 24–25. Accordingly, Plaintiffs need only demonstrate a likelihood—not a substantial likelihood—of success on the merits to prevail on their motion for a preliminary injunction. *See Metro. Council,* 99 F.Supp.2d at 443.

## A. First Amendment Claims

■ "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). However, "in instances where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff must establish a causal link be-

---

1. This case is distinguishable from *City of Los Angeles v. Lyons,* 461 U.S. 95, 96–97, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), where the Supreme Court found that there was no threat of imminent injury, since the Court refused to assume that the plaintiff would violate the law as he had done previously, and thus subject himself to the police department's retribution. Here, by contrast, Plaintiffs clearly intend to participate in the October 29th bike ride. (Bray Aff. ¶ 9; Fennessey Aff. ¶ 10; McSimov Aff. ¶ 10; Regar Aff. ¶ 11; Stephanos Aff. ¶ 11.)

tween the injunction sought and the alleged injury, that is, the plaintiff must demonstrate that the injunction will prevent the feared deprivation of free speech rights." *Bronx Household,* 331 F.3d at 350. Thus, Plaintiffs asserting First Amendment chilling effects claims need to articulate a specific future harm or, at least, the threat of such harm. *See Laird v. Tatum,* 408 U.S. 1, 14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); *Bronx Household,* 331 F.3d at 350. Theoretical or conjectural harm is insufficient. *See Latino Officers Ass'n v. Safir,* 170 F.3d 167, 171 (2d Cir. 1999).

■ Plaintiffs' participation in the Critical Mass bike rides constitutes "expressive association" entitled to First Amendment protection. *See Roberts v. United States Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984); *Sanitation & Recycling Indus., Inc. v. City of New York,* 107 F.3d 985, 995–96 (2d Cir.1997). This freedom protects the rights of individuals to associate for the purpose of participating in activities protected by the First Amendment, including speech, assembly and religion. *Roberts,* 468 U.S. at 618, 104 S.Ct. 3244. "[T]he right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious and cultural ends" has long been accorded First Amendment protection. *See Roberts,* 468 U.S. at 622, 104 S.Ct. 3244; *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 907–09, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982).

Plaintiffs maintain that the Critical Mass rides are intended to promote the environmental and aesthetic benefits of alternative modes of transportation. (Compl.¶ 16.) Because they are meant to espouse a view on an issue of public import—namely, the environment—the Critical Mass bike rides fall within the expansive sweep of activities deemed "expressive association." *See Pi*

*Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh,* 229 F.3d 435, 443 (3d Cir.2000) ("The Supreme Court has cast a fairly wide net in its definition of what comprises expressive activity."); *see Boy Scouts of Am. v. Dale,* 530 U.S. 640, 649, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (holding that Boy Scouts engage in expressive association given that their mission is to "instill values in young people"); *Roberts,* 468 U.S. at 612–13, 104 S.Ct. 3244 (finding that group was engaged in expressive association where its purpose was to foster "a spirit of genuine Americanism and civic interest").

Plaintiffs claim to be fearful of participating in the October 29th bike ride because of the threat that the police will confiscate their bicycles as they did at the last Critical Mass event. (Bray Aff. ¶ 9; Fennessey Aff. ¶ 10; McSimov Aff. ¶ 10; Regar Aff. ¶ 11; Stephanos Aff. ¶ 11.) Importantly, despite their trepidation, Plaintiffs nevertheless intend to participate in the October 29th bike ride. (Bray Supp. Aff. ¶ 8; Affidavit of Dan Fennessey, dated Oct. 28, 2004 ¶ 8; Affidavit of Justin McSimov, dated Oct. 28, 2004 ¶ 8; Affidavit of Allen Regar, dated Oct. 28, 2004 ¶ 8; Affidavit of Thomas Stephanos, dated Oct. 28, 2004 ¶ 8.)

■■ Plaintiffs have not demonstrated that the chilling effect on their First Amendment rights is tangible enough to constitute irreparable harm. A First Amendment chill that is conjectural is insufficient to establish the threat of irreparable injury. *See Latino Officers,* 170 F.3d at 171. In *Latino Officers,* the Second Circuit considered a Police Department policy that officers notify the Department before speaking publicly to outside groups. The Court of Appeals held that, while some officers might be more reluctant to speak because of that regulation, the theoretical possibility of a chilling ef-

fect was insufficient to establish irreparable injury. *See Latino Officers,* 170 F.3d at 171. Here, Plaintiffs, while asserting concerns about the possible seizure of their bicycles, nevertheless do not intend to forego the opportunity to join in the October 29th bike ride. Thus, Plaintiffs offer insufficient evidence that the alleged harm will curtail their expressive activity. *Cf. Bronx Household,* 331 F.3d at 350 (finding irreparable harm where the alleged First Amendment deprivation resulted directly from a City Board of Education policy barring religious services or instruction in schools).

### B. *Due Process Claims*

#### 1. *Irreparable Harm*

Plaintiffs claim that the City deprived them of their bicycles without due process and is likely to do so in future critical mass bike rides, in violation of the Fifth and Fourteenth Amendments. Plaintiffs' allegation of constitutional injury satisfies the irreparable harm prong of the preliminary injunction analysis. *See Statharos v. New York City Taxi & Limousine Comm'n,* 198 F.3d 317, 322 (2d Cir.1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary.").

#### 2. *Likelihood of Success*

■ To succeed on their due process claims, Plaintiffs will have to show (a) a protected property interest and (b) a deprivation of property (c) without an adequate notice and opportunity to be heard. *McMenemy v. City of Rochester,* 241 F.3d 279, 285–86 (2d Cir.2001).

■ Due process protections extend to all property interests, without regard to the relative importance or necessity of the property at issue. *Fuentes v. Shevin,* 407 U.S. 67, 89–90, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (recognizing a valid property interest over household goods such as a stove and a stereo). While one plaintiff is a recreational cyclist, others use their bicycles as their principal mode of transportation. (Bray Aff. ¶ 2; Fennessey Aff. ¶ 2; McSimov Aff. ¶ 2; Regar Aff. ¶ 2; Stephanos Aff. ¶ 2.) For one plaintiff, his bicycle is indispensable to his employment as a messenger. (Stephanos Aff. ¶ 2.) Thus, there is no dispute that Plaintiffs have a valid property interest in their bicycles.

■ Further, even a temporary deprivation of property is sufficient for due process purposes. *Connecticut v. Doehr,* 501 U.S. 1, 12, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991); *Fuentes,* 407 U.S. at 85, 92 S.Ct. 1983; *Krimstock v. Kelly,* 306 F.3d 40, 51 (2d Cir.2002). The fact that Plaintiffs ultimately recovered their bicycles is immaterial. *See United States v. Monsanto,* 924 F.2d 1186, 1192 (2d Cir.1991) (holding that a "temporary and nonfinal ... removal is, nonetheless, a 'deprivation of property' subject to the constraints of due process"). As a result of the City's actions, Plaintiffs were deprived of their bicycles from the time that they were seized until Plaintiffs reclaimed them. In addition, their bicycle locks were destroyed. (Bray Aff. ¶¶ 7–8; Fennessey Aff. ¶¶ 8–9; McSimov Aff. ¶ 9; Regar Aff. ¶¶ 7–8; Stephanos Aff. ¶ 8.) Plaintiffs have established that they were deprived of their property. *See Fuentes,* 407 U.S. at 86, 92 S.Ct. 1983 ("The Fourteenth Amendment draws no bright lines around three-day, 10–day or 50–day deprivations of property.")

■ "The essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and an opportunity to meet it." *Mathews v. Eldridge,* 424 U.S. 319, 348, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (internal quotation marks and alterations omitted). The Fifth and Fourteenth

Amendments generally require notice and a hearing prior to a property deprivation. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993). Failure to provide a predeprivation notice and hearing will pass constitutional muster only in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *James Daniel Good,* 510 U.S. at 53, 114 S.Ct. 492. Even in such extraordinary situations, however, adequate notice and a hearing must be afforded after the deprivation occurs. *See Hellenic Am. Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 881 (2d Cir.1996) ("HANAC's [due process] claims can survive only if New York does not provide adequate postdeprivation procedures.")

The City does not dispute that Plaintiffs were denied a hearing prior to the seizure of their bicycles. Rather, the City contends that the exigencies of the September 24, 2004 Critical Mass bike ride and the clear nature of Plaintiffs alleged violation excused the traditional requirement of a predeprivation hearing.

■ Assuming *arguendo* that Plaintiffs violated N.Y.C. Admin. Code § 16–122 when they left their bicycles unattended along 36th Street, the City had a legitimate governmental interest in enforcing the regulation to facilitate traffic and ensure the safety of the sidewalk. This Court will not second-guess the police supervisors' assessment of the situation on 36th Street on Plaintiffs' motion for a preliminary injunction.

Had the police delayed the seizures and left the bicycles unguarded, Plaintiffs could have unlocked them and gone home or created a new disruption on 36th Street. *See Calero–Toledo,* 416 U.S. 663, 679, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (holding notice and hearing prior to seizure imprac-

ticable where the property could be easily "removed to another jurisdiction, destroyed, or concealed, if advance warning of confiscation were given"); *cf. James Daniel Good,* 510 U.S. at 57, 114 S.Ct. 492 (holding that predeprivation notice and hearing were required before seizure of a home "[b]ecause real property cannot abscond"). The circumstances presented by a chaotic Friday evening in midtown Manhattan were not conducive to a meaningful pre-seizure hearing on 36th Street.

■ The evidence on the motion reveals that the City never informed Plaintiffs of the regulation supposedly justifying the bicycle seizures until this litigation. Procedural due process requires that a person be given "reasonable notice of a charge against him, and an opportunity to be heard in his defense." *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948); *see Brown v. Ashcroft,* 360 F.3d 346, 350–351 (2d Cir.2004) ("At the 'core' of due process is the right to notice of the nature of the charges and a meaningful opportunity to be heard." (internal quotation marks omitted)). Plaintiffs were entitled to be told what the charges against them were. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). While the Police Department flyer circulated to bicyclists in Union Square on September 24th warned that violations of the parade permit and vehicle and traffic laws could result in arrest and bicycle seizure, it did not mention any consequence for leaving bicycles unattended on the sidewalk. (Albano Decl. Ex. D.)

The notion that Section 16–122 was the trigger for the bicycle seizures on 36th Street only surfaced on October 25th in the City's Answer with Counterclaim. Indeed, the City's affidavits reveal that the Police Department intended to issue notices of violation to Plaintiffs when they

reclaimed their bicycles. (Albano Decl. ¶ 16.) As previously noted, the Police Department refrained from issuing citations to Plaintiffs because of its concern that notices of violation would spawn retaliation claims. (Albano Decl. ¶ 16.) Because of the City's failure to provide Plaintiffs with notice of the charges against them, Plaintiffs are likely to succeed on the merits of their due process claims. Accordingly, a preliminary injunction is warranted to prevent a recurrence of bicycle seizures as they occurred on September 24.

### III. *The City's Motion for a Preliminary Injunction*

In a reflex action, the City moves for a preliminary injunction to enjoin Critical Mass bike rides absent a parade permit. The City acknowledges that the bike rides have been spiraling out of control since the July 30th bike ride that paralyzed the F.D.R. Drive. (Tr. at 28.) Apparently, for months, the City has contemplated state court litigation to enforce its parade permit regulations. (Tr. at 28–29.) Despite the calendar's ineluctable advance toward the last Friday of each month, the City endured turbulence on August 27 and September 24 without seeking redress in the state courts. Even with the Halloween bike ride looming, the City did not file suit until after it was served with Plaintiffs' Complaint.

Now, in the context of a circumscribed application by Plaintiffs, the City seeks sweeping relief under a weft of City regulations to enjoin bike rides that have occurred monthly for more than six years. Indeed, at the hearing, the City conceded that it could not pursue its requested relief under N.Y Vehicle and Traffic Law § 1234 because that state statute was superseded by City regulations. (Tr. at 36.) This Court declines the City's invitation to wander into a Serbonian bog before a state court has had an opportunity to illumine the path.

Plaintiffs argue that the doctrine of laches prohibits the City from obtaining equitable relief. Where the nonmovant raises a potentially meritorious laches defense, it is appropriate to consider that issue in the preliminary injunction context. *See Nat. Council of Arab Americans v. City of New York*, 331 F.Supp.2d 258, 265 (S.D.N.Y.2004); *accord Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 132 (2d Cir.2003). Laches "bars injunctive relief where a plaintiff unreasonably delays in commencing an action." *Tri–Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 44 (2d Cir.1994). The doctrine reflects the principle that "he who comes into equity must come with clean hands." *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir.2000) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mech. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945)). Grounds for laches exist when a plaintiff unreasonably and inexcusably delays in seeking an injunction, and the defendant is prejudiced by that delay. *Perez v. Danbury Hosp.*, 347 F.3d 419, 426 (2d Cir.2003); *Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.*, 959 F.2d 409, 423 (2d Cir.1992); *Nat. Council of Arab Americans*, 331 F.Supp.2d at 265.

As previously noted, the City has been aware of the Critical Mass bike rides "for a number of years." (Answer ¶ 31.) The problems with recent rides have been chronicled earlier in this Memorandum and Order. And, even when the bike rides were uneventful (e.g., July 2003), a thousand bicyclists traveling on congested streets poses a logistical challenge for the police. But nothing was done. (Answer ¶ 31.)

The City does not even try to justify its delay. By attempting to use this litigation as its platform, the City has injected a slew of important and complex issues into this action. With only two days to respond to the City's application, the Plaintiffs are prejudiced, and the Court is short-changed. *See Irish Lesbian & Gay Org. v. Giuliani ("ILGO"),* 918 F.Supp. 732, 748–49 (S.D.N.Y.1996) (finding prejudice to defendants in the "preparation and presentation of their respective cases" where plaintiff sought to enjoin the issuance of a parade permit only 19 days before the parade and over one month after the permit had been denied). While not necessarily unconscionable, *see New Era Publ'ns Int'l, ApS v. Henry Holt & Co., Inc.,* 873 F.2d 576, 584–84 (2d Cir.1989), the City's delay is one of the equities that argues strongly against granting its application for a preliminary injunction. *ILGO,* 918 F.Supp at 749. Accordingly, this Court finds the City's application for a preliminary injunction is barred by laches.

▆▆▆▆ Even if the doctrine of laches was not a bar, the need to adjudicate novel and complex state law issues militates against the exercise of supplemental jurisdiction. *See Jinks v. Richland County, S.C.,* 538 U.S. 456, 459, 123 S.Ct. 1667, 155 L.Ed.2d 631 (2003). District courts may decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367 where it would undermine judicial economy, fairness and comity. *See Jones v. Ford Motor Credit Co.,* 358 F.3d 205, 214 (2d Cir.2004). Thus, where pendant claims hinge on unresolved issues of state law, "especially when those questions concern the state's interest in the administration of its government," the principles of comity and federalism weigh heavily in favor of leaving such decisions to the state courts. *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 306 (2d Cir. 2003).

## CONCLUSION

Critical Mass appears to be a surging phenomenon in New York. However, the event's success is spawning potential dangers to participants as well as the citizenry of New York. Several thousand cyclists cannot simply go "wherever their wheels take them" month after month without someone getting hurt. Bike rides of this magnitude require coordination with the police for everyone's safety. Both sides in this litigation need to overcome their preoccupation with the formalism of the parade permit process. In the end, Critical Mass is people, not an event, and they need to take responsibility. Given the fluidity of this matter, the best way to ensure the safety of law-abiding Critical Mass participants is for cyclists and the police to agree each month on the route that the Friday evening bike ride will take.

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is granted in part, and the City's motion for a preliminary injunction is denied. Specifically, the City and its police officers and agents are preliminarily enjoined from seizing bicycles used by participants in the October 29, 2004 Critical Mass bike ride unless said participants are provided with notice of the reasons for seizure or they are charged with a crime or violation of law. This preliminary injunction does not restrain the City and its police officers and agents from enforcing the law or from seizing unattended bicycles during the October 29, 2004 Critical Mass bike ride which obstruct vehicular or pedestrian traffic.

The parties are directed to report in writing to the Court by November 5, 2004 concerning any difficulties encountered in implementing this preliminary injunction in anticipation of a further Order in ad-

vance of the November 26, 2004 Critical Mass bike ride.