Rebecca BRAY, Thomas Stephanos, Justin McSimov, Dan Fennessey, and Allen Regar, Plaintiffs,

v.

THE CITY OF NEW YORK, Raymond Kelly, Police Commissioner of the New York City Police Department, New York City Police Department, New York City Police Officers John and Jane Doe (names and number of whom are unknown at present) and Other Unidentified Members of the New York City Police Department, Defendants.

No. 04 Civ.8255 WHP.

United States District Court, S.D. New York.

Dec. 23, 2004.

Norman Siegel, New York, NY, for Plaintiffs.

Steven J. Hyman, McLaughlin & Stern, LLP, New York, NY, for Plaintiffs.

Michael A. Cardozo, Corporation Counsel of the City of New York, Robin Binder and Sheryl Neufeld, New York, NY, for Defendants, of counsel.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

Defendants (collectively, the "City") move to enjoin Critical Mass bicycle rides from occurring in New York City without a Parks Department or parade permit. The City's request springs from its counterclaim against not only the five individual Plaintiffs, but all participants in Critical Mass bike rides in New York. The counterclaim under New York General City Law § 20(22) seeks to enjoin two distinct types of conduct that the City claims is criminal:[1] (1) gathering in Union Square Park without a Parks Department permit, and (2) engaging in a bicycle procession without a parade permit. Plaintiffs oppose the City's preliminary injunction application and move to dismiss the counterclaim. For the reasons that follow, the City's motion for a preliminary injunction is denied, and Plaintiffs' motion to dismiss is granted.

## BACKGROUND[2]

Critical Mass bike rides have occurred in Manhattan every month since 1994. (Declaration of Lt. Daniel Albano, dated Oct. 25, 2004 ("Albano Decl.") ¶ 3; Declaration of Matthew Roth, dated Nov. 29, 2004 ("Roth Decl.") ¶ 5.) For approximately four years, Union Square Park has been the place where cyclists congregate to begin their rides. (Transcript of Hearing, dated Dec. 8–9, 2004 ("Tr.") at 26, 164.) Although the route is not pre-determined (Roth Decl. ¶ 4), the monthly rides typically proceed from Union Square Park uptown on Park Avenue South, or downtown on Broadway (Tr. at 52, 164). Critical Mass participants concede that they ride through traffic lights, take up the entire roadway and "often get off their bicycles to block intersections," a practice known as "corking." (Tr. at 167.) No one has ever applied for a permit for a Critical Mass ride. (Tr. at 8.)

It is a violation of New York City law for an individual to participate in a parade or procession without a permit issued by the New York City Police Department (the "Police Department"). N.Y.C. Admin. Code § 10–110(a). It is also illegal to hold a "special event" on City parkland without a permit from the Parks Department. 56 R.C.N.Y. §§ 1–05(a), 1–07. In recent months, the City has begun to enforce the parade permit requirement against Critical Mass participants. In October 2004, the Police Department arrested thirty-five individuals and charged them with disorderly conduct and/or parading without a permit. (Declaration of Asst. Chief Bruce Smolka, dated Nov. 11, 2004 ("Second Smolka Decl.") ¶ 13; Tr. at 188.) In November, seventeen participants were arrested for engaging in an un-permitted parade or procession. (Supplemental Declaration of Asst. Chief Bruce Smolka, dated Dec. 6, 2004 ("Third Smolka Decl.") ¶ 9; Tr. at 53, 188.) The Police Department has not acted against bicyclists for assem-

---

1. Every city in New York is empowered "to maintain an action or special proceeding in a court of competent jurisdiction to compel compliance with or restrain by injunction the violation of any such ordinance or local law." N.Y. Gen. City Law § 20(22).

2. Familiarity with this Court's prior Memorandum and Order is presumed. See Bray v. City of New York, 346 F.Supp.2d 480 (S.D.N.Y.2004).

bling in Union Square Park without a special event permit.

## I. *The October 29, 2004 Critical Mass Ride*

On October 29, 2004 at 7:00 p.m., cyclists began to congregate in Union Square Park. (Second Smolka Decl. ¶ 4; Tr. at 26, 164.) By 7:35 p.m., approximately 2500 cyclists were present, with many spilling out of Union Square on to the streets and at times interfering with vehicular traffic. (Second Smolka Decl. ¶¶ 4, 7.) Although the Parks Department had not issued a special event permit, the City did not attempt to disperse the cyclists from Union Square Park. (Tr. at 39.)

Prior to the start of the ride, the Police Department publicized a proposed route to cyclists at the park by distributing a flyer and broadcasting announcements from a sound truck. (Second Smolka Decl. ¶ 6; Affirmation of Wylie M. Stecklow, dated Nov. 29, 2004 ("Stecklow Aff.") ¶¶ 3, 4; Tr. at 41, 159–60.) The route led from Union Square Park, uptown on Park Avenue to 55th Street, west on 55th Street and then downtown on Fifth Avenue. (Second Smolka Decl. ¶ 5, Ex. H; Tr. at 43.) Near Madison Square Park, where Broadway crosses Fifth Avenue at 23rd Street, the riders were to veer on to Broadway and follow it down to Union Square Park. (Second Smolka Decl. ¶ 5, Ex. H; Tr. at 43.)

According to the flyer, the City would not arrest riders who adhered to the proposed route, but anyone who deviated from it and violated traffic regulations would be subject to arrest. (Second Smolka Decl. Ex. H.) The flyer exhorted bicyclists to obey all traffic signs and signals and "ride in usable bicycle lanes or near the curb or edge of the roadway." (Second Smolka Decl. Ex. H.) The flyer also stated that bicycle riding is forbidden on sidewalks, highways, bridges and tunnels, and warned that unattended bicycles, "including those locked to street fixtures, are in violation of NYC Administrative Code § 16–122." (Second Smolka Decl. Ex. H.) Finally, the flyer stated that "[i]t is illegal to participate in a procession on the public streets within New York City if a permit for the procession has not been issued." (Second Smolka Decl. Ex. H.)

The cavalcade of riders proceeded uptown on Park Avenue and spanned approximately fifteen blocks. (Second Smolka Decl. ¶¶ 8, 9; Stecklow Aff. ¶ 5; Tr. at 160.) Police officers "corked" cross-town traffic to allow the cyclists to peddle through intersections *en masse*, and occasionally halted the ride to allow those at the rear to catch up. (Second Smolka Decl. ¶¶ 9, 10; Stecklow Aff. ¶¶ 5, 7–8; Tr. at 160–61.)

Initially, the Critical Mass riders followed the City's proposed route. (Second Smolka Decl. ¶ 8.) A small group splintered off briefly at 52nd Street and Park Avenue but rejoined the route by turning south on Fifth Avenue. (Second Smolka Decl. ¶ 8.) However, as the cyclists headed downtown, a large contingent broke off at 39th Street and Fifth Avenue. (Second Smolka Decl. ¶ 11; Stecklow Aff. ¶¶ 10, 11; Tr. at 61, 148–49.) Thereafter, the ride fragmented into a diaspora of many clusters, some as small as twenty and others as large as five hundred. (Second Smolka Decl. ¶¶ 11, 12.) The Police Department observed cyclists in these break-off groups riding through red traffic signals, outside of bicycle lanes and away from curbs. (Second Smolka Decl. ¶ 12.)

At Madison Square Park, the sanctioned route led off Fifth Avenue on to Broadway. (Second Smolka Decl. ¶ 5.) However, because of a lack of coordination by the Police Department, the entrance to Broadway had been cordoned off. (Declaration of Steven Faust, dated Nov. 29, 2004 ("Faust Decl.") ¶ 10, Ex. A; Third Smolka

Decl. ¶ 6; Tr. at 46–47, 61–62, 132–33, 140.) The ensuing confusion caused many cyclists to turn west on 23rd Street. (Faust Decl. ¶ 11; Tr. at 48, 133.) Police officers later removed the barricade and allowed riders to peddle down Broadway. (Tr. at 162.) Partly because of the police miscommunication, no more than two hundred cyclists followed the authorized route back to Union Square Park. (Second Smolka Decl. ¶ 11.)

The Police Department deployed "several hundred" officers for the October 29th ride. (Tr. at 64.) In total, the City arrested and seized the bicycles of thirty-five participants, all of whom had deviated from the recommended route. (Second Smolka Decl. ¶ 13; Tr. at 188.) According to the Police Department, many more Critical Mass participants violated the traffic laws, but the City was unable to apprehend all of them due to the splintered nature of the event and the congestion it caused. (Second Smolka Decl. ¶ 14; Tr. at 187.)

## II. *The November 26, 2004 Critical Mass Ride*

Approximately two hundred cyclists gathered in Union Square Park for the November 26th Critical Mass ride. (Third Smolka Decl. ¶ 9; Tr. at 74.) Once again, the Police Department distributed a flyer and made loudspeaker announcements. (Declaration of Gideon Oliver, dated Nov. 30, 2004 ("Oliver Decl.") ¶¶ 3, 4; Tr. at 50.) This time, the flyer stated that no permit had been issued for the event and warned riders: "If you choose to ride in a procession this evening, you will be arrested and your bicycle will be seized." (Oliver Decl. ¶ 3; Pl.Ex. 1; Tr. at 50.) The City made

no attempt to disperse riders from the park. (Tr. at 51.) In contrast to the previous Critical Mass ride, the Police Department did not propose a route. When the ride began, cyclists scattered from Union Square Park in all directions. (Oliver Decl. ¶ 6; Tr. at 52.)

The City arrested seventeen participants and charged them with engaging in a parade or procession without a permit, in violation of Administrative Code § 10–110. (Third Smolka Decl. ¶ 9; Tr. at 53, 188.) Seven of these arrests took place on Union Square West. (Tr. at 53–54.) Six cyclists were also given traffic summonses. (Third Smolka Decl. ¶ 9.)

The next Critical Mass ride in New York is scheduled for the last Friday in December, which is New Year's Eve. (Tr. at 175.)

## III. *Procedural History*

Plaintiffs, five cyclists who participated in the September 24, 2004 Critical Mass ride but were not arrested, filed this action alleging that the City violated their constitutional rights by seizing their bicycles without notice. They moved for a preliminary injunction to prevent such seizures in subsequent rides. The City counterclaimed and, pursuant to New York General City Law § 20(22), moved to enjoin Critical Mass rides from occurring in New York without a parade permit.[3] On October 28, 2004, this Court granted Plaintiffs' motion in part, and denied the City's motion under the doctrine of laches. *See Bray*, 346 F.Supp.2d 492.

The City's latest motion for a preliminary injunction seeks to prevent Plaintiffs

---

3. With leave from this Court, *see Bray v. City of New York*, No. 04 Civ. 8255(WHP), 2004 WL 2852072, at *1 (S.D.N.Y. Dec.13, 2004), the City amended its Answer With Counterclaim. *See* Answer With Amended Counterclaim, dated Dec. 15, 2004 ("Amended An-

swer"). The Amended Answer also alleges that Plaintiffs and other Critical Mass participants congregate illegally in Union Square Park before each ride without a special event permit from the Parks Department. (Amended Answer ¶¶ 25–34.)

and all others on notice from gathering in Union Square Park or participating in Critical Mass rides without the permits required by New York City law. Arguing that this Court should decline to extend its supplemental jurisdiction to the City's state and local law claims, Plaintiffs oppose the motion and move to dismiss the counterclaim.

## DISCUSSION

### I. Plaintiffs' Motion to Dismiss

Plaintiffs contend that this Court should decline to exercise its supplemental jurisdiction over the City's counterclaim either by invoking its discretion under 28 U.S.C. § 1367(c), or by abstaining because the counterclaim implicates complex state administrative procedures. *See Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). This Court may not entertain the City's motion for a preliminary injunction if supplemental jurisdiction is lacking or imprudent.

#### A. Supplemental Jurisdiction

A court with original federal jurisdiction over certain claims has supplemental jurisdiction over state law claims "that are so related ... that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Two claims constitute the "same case or controversy" when they arise from a "common nucleus of operative fact." *See Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 213–14 (2d Cir.2004) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)); *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 704 (2d Cir.2000) (same).

Even when state and federal claims are intertwined, a court must examine four factors to determine whether exercising supplemental jurisdiction would be prudent. *Jones*, 358 F.3d at 214. A court may, in its discretion, decline to exercise jurisdiction over a state law claim if

> (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c); *see Valencia v. Lee*, 316 F.3d 299, 305 (2d Cir.2003). When any one of these factors is present, the court should exercise supplemental jurisdiction only if doing so would promote "economy, convenience, fairness, and comity." *Jones*, 358 F.3d at 214; *Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 140 F.3d 442, 446–47 (2d Cir.1998).

#### 1. "Same Case or Controversy"

■ To the extent the City's counterclaim alleges that Critical Mass rides occur without a parade permit, it is part of the underlying case or controversy. Plaintiffs maintain that the seizure of their bicycles on September 24, 2004 violated both their due process rights and their First Amendment right to free association. (Complaint, dated Oct. 19, 2004 ("Compl.") ¶¶ 55, 59.) As to the free association claim, Plaintiffs contend that the City confiscated their bicycles because of their participation in Critical Mass. (Compl.¶ 59.) The City counters that it seized the bicycles, in part, "to redress [P]laintiffs' participation, and prevent their continued participation, in the September Critical Mass bike ride, an unlawful procession that was dangerous to the public safety." (Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction, dated Oct. 25, 2004, at 11; *see* Albano Decl. ¶ 15.) The question whether Critical Mass rides are an unlawful procession per-

meates Plaintiffs' claims and the City's counterclaim. Since they present the same case or controversy, this Court has supplemental jurisdiction over the parade permit element of the City's counterclaim. *See Jones,* 358 F.3d at 213–14.

■ However, to the extent the City alleges that Critical Mass participants gather in Union Square Park without a Parks Department permit, the counterclaim is unrelated to Plaintiffs' claims. The City's allegation concerns the bicyclists' conduct *before* the monthly Critical Mass ride begins, whereas Plaintiffs' claims relate only to the ride itself. *Cf. Jones,* 358 F.3d at 213–14 (holding that a permissive counterclaim constitutes the same Article III case as the plaintiffs' claims because "[b]oth ... originate from the Plaintiffs' decisions to purchase Ford cars"). Moreover, the City does not aver that it seized Plaintiffs' bicycles on September 24, 2004 to redress violations of the special event permit requirement. There is no logical connection between the claims, other than the fact that they both relate to Plaintiffs' status as Critical Mass participants. This is not sufficient. *See Bu v. Benenson,* 181 F.Supp.2d 247, 254 (S.D.N.Y.2001) (finding supplemental jurisdiction lacking where the state law claims "involve different rights, different interests, and different underlying facts" than the federal law claims). Accordingly, the special event permit allegation in the City's counterclaim constitutes a separate case or controversy from Plaintiffs' claims, and this Court lacks supplemental jurisdiction over it.

### 2. *Section 1367(c) Factors*

Having established that supplemental jurisdiction exists over part of the City's counterclaim, the four factors enumerated in 28 U.S.C. § 1367(c) must be examined to determine whether exercising jurisdiction would be appropriate.

First, this Court has not dismissed or finally ruled on Plaintiffs' federal law claims. *See* 28 U.S.C. § 1367(c)(3). Second, neither party has pointed to, and this Court does not discern, any "exceptional circumstances" that would weigh against retaining jurisdiction. *See* 28 U.S.C. § 1367(c)(4). In fact, "declining jurisdiction outside the ambit of 1367(c)(1)(3) appears as the exception rather than the rule," to be done "only if the circumstances are quite unusual." *Itar–Tass,* 140 F.3d at 448 (internal quotation omitted). Accordingly, this Court focuses its analysis on whether the counterclaim raises novel or complex issues of state law and whether it substantially predominates over Plaintiffs' federal claims.

### a. *Novel or Complex Issues of State Law*

■ "Where a pendent state law claim turns on novel or unresolved questions of state law, especially where those questions concern the state's interest in the administration of its government, principles of federalism and comity may dictate that these questions be left for decision by the state courts." *Seabrook v. Jacobson,* 153 F.3d 70, 72 (2d Cir.1998). The City maintains that its counterclaim does not present novel or complex issues because the parade permit regulation is explicit and unambiguous.

The New York City Administrative Code provides that "[a] procession, parade, or race shall be permitted upon any street or in any public place only after a written permit therefore has been obtained from the police commissioner." N.Y.C. Admin. Code § 10–110(a). While the City labels Critical Mass a "procession," that moniker begs the question on which the counterclaim turns.

A "parade or procession" is defined as "any march, motorcade, caravan, prome-

nade, foot or bicycle race, or similar event of any kind, upon any public street or roadway." 38 R.C.N.Y. § 19–02(a). The City argues that Critical Mass is a "parade or procession" because "[t]he conduct of [its] riders fits squarely within this definition." (Defendants' Memorandum in Support of a Preliminary Injunction, dated Nov. 12, 2004 ("Def.Mem.") at 15.). Specifically, the City contends that every Critical Mass ride is a parade or procession because its participants travel in a group while violating provisions of the New York State Vehicle and Traffic Law and the New York City Department of Transportation's Traffic Rules. (Def. Mem. at 9, 15.) But 38 R.C.N.Y. § 19–02(a) makes no reference to traffic laws and includes specific types of processions that may not violate traffic laws (e.g., a "caravan"). The statute does no more than list specific types of parades and processions, without explaining what makes them so. Apart from bicycle races, the definition provides no guidance concerning when a group of cyclists is required to obtain a parade permit. Thus, the City's interpretation does not follow ineluctably from the statutory language.

Indeed, the issue appears to be one of first impression. Defendants have submitted no legal authority to support the proposition that the defining factor of a "parade or procession" is disobedience of a traffic law. In fact, neither party has directed this court to any decision—either by a state or federal court—interpreting the phrase "parade or procession" as used in the Administrative Code. See Walsh v. Nat'l Westminster Bancorp, Inc., 921 F.Supp. 168, 174 (S.D.N.Y.1995) (declining to exercise supplemental jurisdiction because "neither party has cited any New York cases on this issue"). The City offers three decisions involving organizers of marches and car processions who unsuccessfully sought parade permits for their events. (Defendants' Reply Memorandum

in Further Support of a Preliminary Injunction, dated Dec. 6, 2004 at 3–4.) However, in those cases, the scope of § 10–110(a) was not at issue because each plaintiff conceded that the planned event was a "parade or procession" by applying for a parade permit. See MacDonald v. Safir, 206 F.3d 183, 186 (2d Cir.2000); Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 643 (2d Cir.1998); United Yellow Cab Drivers Ass'n v. Safir, No. 98 Civ. 3670(WHP), 2002 WL 461595, at *2 (S.D.N.Y. Mar.22, 2002).

Thus, the applicability of the parade permit requirement has not been adequately delineated by any federal or state court decision. As such, the City's counterclaim presents novel questions of state and local law, which militate strongly against exercising supplemental jurisdiction. See Bad Frog Brewery, Inc. v. New York State Liquor Auth., 134 F.3d 87, 102 (2d Cir. 1998); Seabrook, 153 F.3d at 72; Wright v. Giuliani, No. 99 Civ. 10091(WHP), 2000 WL 777940, at *8 (S.D.N.Y. June 14, 2000) (declining supplemental jurisdiction because "[t]he state and local law claims at issue ... present novel questions regarding the interpretation of state common law and a City ordinance").

b. *Predominance of State Law Claims*

■ A state law claim predominates over a federal claim when the number of people its resolution will affect overwhelms those impacted by the federal claim. See Bu, 181 F.Supp.2d at 255 (declining to exercise supplemental jurisdiction because the federal claims related to "a small number of parties" but the state law claims involved "hundreds of people"). Five Critical Mass participants challenged the constitutionality of the City's bicycle seizure in this action. Plaintiffs seek a declaratory judgment and permanent injunction enjoining the City from seizing bicycles of

Critical Mass participants who are not charged with a crime or violation of law. (Compl. at 16–17.) The counterclaim over which the City seeks to have this Court exercise supplemental jurisdiction is brought against a putative class consisting of all Critical Mass cyclists. (Amended Answer ¶¶ 26, 50.) Therefore, as the pleadings make clear, each side seeks broad relief that would affect all Critical Mass riders.

Moreover, in reply to the City's counterclaim, Plaintiffs challenge the constitutionality of the parade permit requirement. (Plaintiffs' Memorandum in Support of Motion to Dismiss, dated Nov. 30, 2004 at 20–23.) As such, questions of federal law figure prominently in the ultimate resolution of the counterclaim. *See Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 167 n. 4 (2d Cir.1989) (noting that the existence of federal defenses, "[w]hile not determinative, . . . would lend support to a decision by the district court to exercise pendent jurisdiction over a state law claim"); *see also Gibbs*, 383 U.S. at 727, 86 S.Ct. 1130 ("[T]he state claim implicates the federal doctrine of preemption; while this interrelationship does not create statutory federal question jurisdiction, its existence is relevant to the exercise of discretion." (internal citation omitted)). Accordingly, the City's state law counterclaim does not substantially predominate over Plaintiffs' federal claims.

### 3. *Economy, Convenience, Fairness and Comity*

■ Although the City's counterclaim presents novel issues of state and local law, this Court should exercise its supplemental jurisdiction if it serves the interests of economy, convenience, fairness and comity. *Itar–Tass*, 140 F.3d at 446–47; *see Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity."). The City contends that retaining jurisdiction furthers these interests because this action presents a unique opportunity to assert civil claims against Critical Mass participants. If forced to proceed anew in state court, the City argues that it would "again be placed in the difficult position of trying to identify and obtain jurisdiction over individuals who intend to participate in future Critical Mass rides." (Def. Mem. at 11.)

As an initial matter, the five plaintiffs in this action have not indicated whether they intend to ride in future Critical Mass rides. Rather, they averred only that they participated in the September 24th Critical Mass ride and planned to ride again on October 29th. (*See, e.g.,* Affidavit of Rebecca Bray, dated Oct. 18, 2004 ¶ 3; Affidavit of Rebecca Bray, dated Oct. 28, 2004 ¶ 8.) In fact, only two Plaintiffs participated in the October 29th ride, and none of them rode on November 26th. (Tr. at 218.) Even if the City is correct that the parade permit requirement is triggered when bicyclists violate traffic laws, there is no evidence that Plaintiffs rode in the middle of the street or through a red light, or committed any other traffic infraction. In contrast, the City arrested scores of Critical Mass participants for parading without a permit and issued summonses for traffic law violations. (Second Smolka Decl. ¶ 13; Third Smolka Decl. ¶ 9; Tr. at 35, 53.) Thus, these Plaintiffs are not uniquely situated to defend against the City's claim.

The City's rationale for seeking a federal injunction also contravenes this Court's interest in promoting fairness and comity. Because no applicant has stepped forward to seek a parade permit, the City believes that an injunction will assist its law en-

forcement efforts. According to the Police Department, "[a]n injunction by this Court would have a greater deterrent effect with individual cyclists who might otherwise be less concerned about violating traffic regulations." (Second Smolka Decl. ¶ 19.)

However, while some of the City's difficulties in apprehending violators are generated by the spontaneous and unpredictable nature of Critical Mass, they were also spawned by the City itself. For example, three times prior to July 2004, Critical Mass participants rode down West Street, through the Battery Park Tunnel and on to the F.D.R. Drive. (Roth Decl. ¶ 14; Tr. at 168.) On two of these occasions, the cyclists proceeded over the Brooklyn and Manhattan Bridges. (Roth Decl. ¶ 14.) Police officers monitoring these rides did not punish these clear traffic violations. (Roth Decl. ¶ 14.) Moreover, police officers have facilitated Critical Mass rides by "corking" intersections to allow bicyclists to proceed without interruption from cross-town traffic. (Roth Decl. ¶ 13; Second Smolka Decl. ¶ 9; Stecklow Aff. ¶ 5; Tr. at 14, 32, 160.) police officers have also ushered Critical Mass riders through red lights. (Tr. at 14, 32, 136, 166.) After allowing Critical Mass rides in Manhattan for ten years without permits and in a manner that the City contends violates the Vehicle and Traffic Law, the Police Department has acquiesced to the very conduct it now seeks to prohibit.

■ The present application for preliminary relief ignores a ten-year stasis in enforcement of traffic regulations and permit regimes against Critical Mass rides. It seeks to transmogrify local ordinance violations into potential federal contempt proceedings. (Tr. at 56–57 ("I think [an injunction] would give us . . . the added support of having an additional charge from the federal court, backing us up in determining that the conduct has to be

lawful."), 180–87.) Tellingly, the Police Department conceded that it "can enforce the laws without an injunction, but an injunction would be helpful." (Tr. at 4; see also Tr. at 62 ("[S]ome people are not fearful of being arrested for a traffic violation, and they go about committing these various violations. I think the injunction would help give weight to it and perhaps a more severe penalty.").) However, injunctive relief is proper only if the party seeking it has no adequate remedy at law, not when it would be merely "helpful." See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); Northern Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306, 105 S.Ct. 459, 83 L.Ed.2d 388 (1984). If Critical Mass participants defy the parade permit law, the City has enforcement authority and is fully capable of policing and punishing violators. See N.Y.C. Admin. Code § 10–110(a).

The City points to other decisions in which New York General City Law § 20(22) was invoked by a municipality seeking to enjoin criminal conduct. See, e.g., Town of Washington v. Duchess Quarry & Supply Co., 250 A.D.2d 759, 673 N.Y.S.2d 183 (2d Dept. 1998); Inc. Vill. of Freeport v. Jefferson Indoor Marina, Inc., 162 A.D.2d 434, 556 N.Y.S.2d 150 (2d Dep't 1990); City of New York v. Bilynn Realty Corp., 118 A.D.2d 511, 499 N.Y.S.2d 1011 (1st Dep't 1986). Notably, these actions were litigated in state courts, which have the most direct interest in construing New York law.

■ The City's gambit for preliminary relief disregards the state courts' interest in interpreting New York laws and this Court's interest in enforcing its orders. Instead of bringing alleged violators of the federal injunction before this Court, the City intends to haul them into state court on charges of criminal contempt—a misde-

meanor under New York law. (Tr. at 63, 181, 223 ("I don't think coming back to this Court for any sort of contempt proceeding is at all practical.").) However, federal courts have a cardinal interest in ensuring strict compliance with their orders. *See EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers,* 925 F.2d 588, 593 (2d Cir.1991); *Ermenegildo Zegna Corp. v. Lanificio Mario Zegna S.P.A.,* No. 85 Civ. 6066(PKL), 1996 WL 721079, at *4 (S.D.N.Y. Dec.13, 1996). This Court's decrees are more than merely additional tools for local law enforcement. Undoubtedly, a federal decree would be "helpful" to the Police Department. However, to issue an injunction on such a gossamer thread would stretch this Court's jurisdiction beyond the limited elasticity of Article III.

■ Lastly, comity dictates that this Court avoid entanglements in the enforcement of local laws involving novel questions. Judicial restraint is the prudent course where the path through state and local law is not illumined. *See Valencia,* 316 F.3d at 307–08 (holding that the district court abused its discretion by retaining jurisdiction over state claims which "raised unsettled questions of New York law"); *Seabrook,* 153 F.3d at 72; *Castellano v. Bd. of Trustees of the Police Officers' Variable Supplements Fund,* 937 F.2d 752, 758 (2d Cir.1991); *Wright,* 2000 WL 777940, at *8. Notwithstanding Plaintiffs' federal defenses, the interest of comity between federal and state courts overrides any interest this Court may have in deciding the City's counterclaim. *See New York v. Philip Morris Inc.,* No. 97 Civ. 794(LMM), 1998 WL 2574, at *4 (S.D.N.Y. Jan.5, 1998) (declining to exercise supplemental jurisdiction while noting that "[t]here is no reason why a state court cannot properly resolve federal defenses"). Indeed, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs,* 383 U.S. at 726, 86 S.Ct. 1130. Rather than accepting the City's invitation to entertain the novel questions raised, this Court will heed Justice Cardozo's admonition and subordinate "[t]he summum jus of [its] power ... to a benign and prudent comity." *Mut. Life Ins. Co. of N.Y. v. Johnson,* 293 U.S. 335, 339, 55 S.Ct. 154, 79 L.Ed. 398 (1934) ("At least in cases of uncertainty, we steer away from a collision between courts of state and nation when harmony can be attained without sacrifice of ends of national importance.").

Accordingly, this Court declines to exercise supplemental jurisdiction over the City's counterclaim and need not address Plaintiffs' arguments regarding abstention.

*CONCLUSION*

The City expresses concern that dismissal of its counterclaim on jurisdictional grounds would be "a subtlety lost on the public." (Def. Mem. at 11–12.) Mindful of that consideration, to the extent Critical Mass participants violate City laws, this ruling does not condone their conduct. Nor does this Court decide whether Critical Mass rides run afoul of the City's permit regimes. Rather, this Court recognizes that judicial interpretation of novel local regulations should be made in the first instance by a state court with primary jurisdiction over such matters.

Accordingly, the City's motion for a preliminary injunction is denied. Plaintiffs' motion to dismiss the City's amended counterclaim is granted, and that counterclaim is dismissed without prejudice.